## Staunton.

## M. C. McCorkle & Son v. Kincaid and Others.

### September 20, 1917.

### Absent, Burks, J. .

1. Appeal and Error—*Harmless Error—Construction of Contract by Court.*—Although it is error for an instruction to submit to the jury the construction of a contract when it was the duty of the court to construe it, yet where the error is favorable to the plaintiffs in error and not injurious to them, it is harmless as to them.

2. Trees and Timber—*Sale of Standing Timber—Reservation of Tan Bark—Measure of Damages.*—A contract for the sale of growing timber gave the lumbermen two years from the date thereof within which to manufacture and remove the timber. The contract reserved to the landowners the tan bark on certain trees, which trees were to be felled and peeled by the landowners at such time "during the peeling seasons" as would not be inconvenient to the lumbermen for the manufacture of the trees. It appeared that the tan bark could only be conveniently and profitably taken from the trees during the months of April, May and June. Upon a fair construction of this contract, the landowners were to have at least two tan bark seasons in which to secure the tan bark, and the lumbermen violated the contract by felling the trees in question before the second tan bark season began. As the lumbermen were to have two years in which to perform their contract, so the landowners were also to have a reasonable time in which to secure the tan bark. That reasonable time is not only indicated by the two years fixed for the benefit of the lumbermen, but also by the use of the plural "seasons" in the contract. The landowners were entitled to recover as damages the fair value of the tan bark of which they were deprived.

3. Contracts—*Construction—Parol Evidence.*—The antecedent conversations and agreements between the parties, so far as they are in conflict with a written contract, cannot, of course, be received to vary or contradict it, but if its meaning be doubtful the surrounding circumstances, the condition and avowed

purposes of the parties, as well as the subject matter of the contract, may be proved by parol testimony in order to enable the court to determine its meaning.

4. MERCHANTABLE TIMBER.—A contract ior the sale of growing timber provided that the timber was to be of sound, merchantable quality. Within the meaning of this contract, sound merchantable logs are logs that have a commercial value for manufacture into lumber and such as were ordinarily used for that purpose in that locality. What is merchantable in one locality may be unmerchantable in another locality, and it is error to instruct the jury that the test of whether a log has a merchantable value is that "when cut into lumber, it produced all or any of the grades of lumber known and recognized as merchantable lumber in the lumber markets."

5. TREES AND TIMBER—*Sale of Growing Timber—Damages for Breach of Contract.*—Where a landowner sells his timber and receives the purchase price therefor in full, upon condition that the timber is to be severed and removed within a limited time, then all such timber or logs, although paid for, which remain upon the property at the end of the time limited, revert to the owner of the land, and the lumberman cannot recover such timber or lumber, or the value thereof.

6. TREES AND TIMBER—*Sale of Growing Timber—Damages for Breach of Contract.*—Where a landowner sells his timber but does not receive the purchase price therefor in full, and timber covered by the contract is left growing, and logs left in the woods which should have been taken out, nevertheless the landowner cannot recover for the contract value of this timber and these logs because they remained his property and were still in his possession, and if they were utilized or by reasonable diligence could have been utilized by him, any amounts realized, or which could have been thus realized, therefrom should be set off against the damage which the jury might find in favor of the landowner.

7. TREES AND TIMBER—*Contract of Sale—Lumber Used in Buildings.*—A contract for the sale of growing timber provided that the lumbermen should have the right to erect on the premises necessary buildings for the manufacture of the timber, the buildings to revert to the landowner when the lumbermen had finished the manufacture and removal of the timber, and the amount of lumber used in the construction of the buildings to be deducted from the amount of timber measured during the current month. The words in the contract "amount of lumber" and "amount of timber" are to be construed to refer both to quantity and value, and where inferior timber is

used in the construction of the buildings, only the actual value thereof should be deducted and not the average value paid by the lumbermen for all the logs.

8. TREES AND TIMBER—*Contract of Sale—Lumber Used in Buildings—Building.*—Platforms or docks running out on a level with the mill floor upon which the lumber is taken on cars and stacked for the purpose of drying, are not buildings within the meaning of the contract referred to in the preceding syllabus, and hence the logs from which the lumber was made out of which they were constructed should be paid for.

Error to a judgment of the Circuit Court of Lee county, in an action of assumpsit. Judgment for plaintiffs. Defendants assign error.

*Reversed.*

The opinion states the case.

*Irvine & Stuart* and *C. R. McCorkle,* for the plaintiffs in error.

*Bullitt & Chalkley* and *Pennington & Pennington,* for the defendants in error.

PRENTIS, J., delivered the opinion of the court.

B. F. Kincaid and Martha E. Kincaid, his wife, hereinafter called the landowners, by contract dated the 10th of December, 1912, sold the timber growing upon three tracts of land owned by them to M. C. McCorkle & Son, the plaintiffs in error, hereinafter called the lumbermen, and this suit is brought to recover damages of them for alleged breaches of that contract. So much of the contract as is involved will be hereinafter referred to and quoted. There was a verdict and judgment for the landowners.

The questions to be determined are not easy of solution.

One of the points of controversy requires the consideration of these clauses of the contract:

"It is agreed between the parties hereto that the parties of the second part" (meaning the lumbermen) "shall have two years from the date hereof within which to manufacture and remove said timber from the said premises; provided, however, that if the parties of the second part shall find it necessary to suspend operations for a time, on account of unfavorable market conditions, or a general business depression, the time for the manufacture and removal of said timber shall be extended for a like period.

"The parties of the first part (meaning the landowners) "hereby reserve the tan bark on the aforesaid chestnut oak trees, which said trees are to be felled and peeled by the parties of the first part at such time during the peeling seasons as will not be inconvenient to the parties of the second part for the manufacture of said trees."

It appears that tan bark can only be conveniently and profitably taken from the trees during the months of April, May and June, when the trees are green and the sap is rising. The lumbermen commenced cutting the timber in the early part of 1913 and completed it in April, 1914, so that the landowners had only one tan bark season, that of 1913, in which to fell these chestnut oak trees and secure the tan bark. A large part of these trees were felled by the lumbermen in 1914, before the tan bark season began, notwithstanding the protest of the landowners and they were thus deprived of their right to fell them and thus to secure the tan bark therefrom.

It is claimed for the lumbermen that the reservation of this bark and the right reserved by the landowners to fell the chestnut oak trees was only a subordinate feature of the contract and subject to their right to manufacture and remove all of the said timber within two years; that while they had the right to take two years in which to fell, manu-

facture and remove it, they were under no obligation to take as long as two years, if they found it convenient to complete their work in less time; and that there being less timber upon the land than was anticipated, it would have been very inconvenient and expensive for them to have prolonged their operations through the tan bark season of 1914.

On the other hand it is claimed for the landowners that a fair construction of the contract shows that they were to have at least two tan bark seasons in which to secure the tan bark, and that the lumbermen violated the contract by felling the chestnut oak trees before the second tan bark season began and thereby deprived them of the tan bark which they had expressly reserved.

The trial court gave an instruction for the plaintiff, marked No. 1, which reads thus:

"As to tan bark the court instructs the jury that where there is a plain written contract and nothing more, it is the duty of the court and not the jury to construe the contract and determine the meaning thereof; but where a contract is of doubtful meaning then verbal conversations and agreements between the parties before and at the time the contract is made are admissible in evidence for the purpose of clearing up such doubt, provided such verbal conversations and agreements do not contradict the written contract. It is for this reason that the court has let in evidence of what occurred between the parties about the tan bark before and at the time the contract was made. Under such circumstances it becomes the duty of the jury, guided by the court, to determine the meaning of the contract after considering the writing itself and all evidence in the case; and the jury are instructed that if they believe from said writing and said evidence that it was the intention of the parties that the plaintiffs should have two peeling seasons in which to cut and peel said tan bark trees,

and were only to be required to cut and peel during the first season the trees on the mountain side, then they will find for the plaintiffs as to said tan bark the amount they may believe from the evidence the same was worth as it stood on the trees at the time the trees were cut by defendants."

This instruction is attacked upon the ground that it submits to the jury the construction of the contract, whereas it was the duty of the court to construe it. This is undoubtedly true, but in this case that error was favorable to the plaintiffs in error and not injurious to them. While by no means free from doubt, it seems to us that the fair construction of this contract is that, as both parties understood and believed that it would take at least two years to cut and remove the timber, and that as the lumbermen were to have two years in which to perform their contract, so the landowners were also to have a reasonable time in which to secure the tan bark. That reasonable time is not only indicated by the two years fixed for the benefit of the lumbermen, but also by use of the plural "seasons" in the contract. The antecedent conversations and agreements between the parties, so far as they are in conflict with the written contract, cannot, of course, be received to vary or contradict it, but if its meaning be doubtful the surrounding circumstances, the condition and avowed purposes of the parties, as well as the subject matter of the contract, may be proved by parol testimony in order to enable the court to determine its meaning. It will be noted that in the contract not only is the tan bark on the chestnut oak trees reserved by the landowners, but the trees are to be felled by them, and this reservation should be considered in connection with that part of the contract giving the lumbermen two years in which to fell the other trees.

Upon a fair consideration of the language and subject matter of the contract as well as the avowed purposes and

objects thereof, we are of opinion that the court should have construed it to mean that the landowners were to have at least two peeling seasons within which to fell these trees and secure the tan bark; hence, that the action of the lumbermen in felling them before the two peeling seasons had elapsed was a violation of the contract, and that the landowners are entitled to recover as damages the fair value of the tan bark of which they were thus deprived by such violation.

2. The contract provided (referring to all of the timber) that "the said timber is to be of sound, merchantable qual-. ity, and is to be measured in the log, at the smallest diameter, according to Scribner's and Doyle's rules, as adopted by the Hardwood Manufacturers Association of the United States, on the skidway at the mill or mills to be erected by the parties of the second part on said premises, said measurement to be made at the joint expense of the parties hereto," etc.

It is alleged that the court erred in giving and refusing instructions and in admitting evidence as to the proper construction to be put upon the words, "the said timber is to be of sound, merchantable quality." The evidence introduced threw little light on the question and cannot be said to have either harmed or helped either party to the controversy.

The court, however, gave an instruction reading thus: "The court further instructs the jury that a sound, merchantable log is a log that has a commercial value, and it has a commercial value if, when cut into lumber, it produces all or any of the grades of lumber known and recognized as merchantable lumber in the lumber markets."

The question as to what is a merchantable, sound log was considered in the case of *Tenny & McKenzie* v. *Mulvaney & Bemis,* 9 Ore. 405, where the court in construing the words "sound, merchantable logs" says this: " 'Mer-

chantable' logs, then, in reference to the business of manufacturing lumber in any particular locality, are such logs as are ordinarily used for that purpose at that particular place, and if the usage of the business in that locality requires the logs ordinarily used to be 'good and sound,' then the word 'merchantable' would include the particular meaning of each, and render their employment of no utility in any such contract. But whatever distinction should properly be made as to the respective meanings of the words used in this instance, we think it was clearly competent to show by the witness that the logs in controversy were of the quality usually manufactured into lumber in that locality, to prove that they were 'merchantable' logs."

In *Wright* v. *Bentley Lumber Co.,* 186 Ala. 619, 65 So. 354, this is said: "As to what was merchantable pine timber in 1906, was a question of proof, and it was incumbent upon the defendants to show that the timber cut and removed by them came within the deed under which they were claiming. 'Merchantable pine timber' referred to the sale and manufacture of pine timber, and included such timber as was ordinarily used for sale or manufacture in that locality."

This definition meets with our approval. What is merchantable in one locality may be unmerchantable in another locality, and the court erred when it instructed the jury that the test of whether a log has a merchantable value is that "when cut into lumber, it produced all or any of the grades of lumber known and recognized as merchantable lumber in the lumber markets." This is a contract referring primarily to logs and not to lumber, and the jury should have been told that, within the meaning of this contract, sound, merchantable logs are logs that have a commercial value for manufacture into lumber and such as were ordinarily used for that purpose in that locality. Under the instruction as given, the jury would have been

justified in finding that any tree in the woods might have produced some small quantity of some inferior grade of merchantable lumber, and hence that every log not decayed was merchantable. We therefore think that the instruction as given was erroneous.

3. Plaintiffs' instruction No. 2, given by the court, was as follows: "The court further instructs the jury that in deciding whether timber is merchantable or not they are not to take into consideration where the timber was located nor whether it could be hauled out and manufactured by the defendants at a profit or not. It makes no difference whether it may cost to get it out more or less than it will yield.

"The court further instructs the jury that they will find for the plaintiffs the value at the contract prices of all timber (if any) that was sound and merchantable and left in the woods by defendants."

The last clause of this instruction is erroneous, because it tells the jury that they must find for the plaintiffs the value at contract prices of all timber, if any, that was sound and merchantable and left in the woods by defendants.

In this connection the defendants asked the court to give an instruction which presents the contrary view and reads thus: "The court further instructs the jury that even if they should believe from the evidence that the defendants did not pay plaintiffs for all the logs and trees which they contracted to pay for but left some trees and some logs on the lands covered by the contract in question for which they did not pay, but should have paid, yet if they further believe from the evidence that the plaintiffs utilized the trees and logs so left, or any part of them, and realized anything therefor, or by the use of reasonable diligence could have utilized the same and realized therefor, or can yet do so, then such sums as the plaintiffs realized, or by

the use of reasonable diligence should have realized, or can
yet realize therefor, or for the use thereof, must be cred-
ited to the defendants against any damages which the jury
may find for the plaintiffs, but not so as to exceed the
same."

The lumbermen's theory of the case thus presented was
that, even though timber covered by the contract had been
left growing, and even if logs had been left in the woods
which should have been taken out, nevertheless the land-
owners could not recover for the value of this timber and
these logs because they remained their property and were
still in their possession, and that if they were utilized by
them, or by reasonable diligence could have been utilized
by them, any amounts realized, or which could have been
thus realized, therefrom should be set off against the dam-
age which the jury might find in their favor.  This latter
view is the correct one.  The question was, what was the
landowners' damage for the failure to take the sound and
merchantable logs which, under the contract, still remained
the property of the plaintiff?  The court seems to have
taken the view that the case was controlled by a line of
cases involving a different principle, for it is perfectly well
settled in this State by the cases of *Smith* v. *Ramsey,* 116
Va. 530, 82 S. E. 189; *Blackstone Mfg. Co.* v. *Allen,* 117
Va. 452, 85 S. E. 568, and *Wheeler Co.* v. *Hite,* 119 Va. 345,
89 S. E. 101, that where a landowner sells his timber and
receives the purchase price therefor in full, upon condi-
tion that the timber is to be severed and removed within
a limited time, then all such timber or logs, although paid
for, which remain upon the property at the end of the time
limited revert to the owner of the land, and that the lum-
berman cannot recover such timber or lumber, or the value
thereof.  In those cases, however, the landowner was mak-
ing no claim whatever against the lumberman.  Here the
landowner is suing the lumberman, and while entitled to

recover for all damage which he has suffered by virtue of the breach of the contract, he is not entitled to recover for damage which he has not suffered. So that in this case the lumbermen who were being charged with the value of this growing and severed timber, were entitled to set off against such claim any sum which might fairly be realized by the landowners from logs and timber which were left in their possession and ownership. The soundness of this view may be illustrated by supposing that the lumbermen had done nothing under their contract and at the end of the two years the landowners were in possession of their property just as it existed when the contract was made. Undoubtedly an action would lie against the lumbermen for the damage arising from the breach of their contract, but in such case it would be erroneous not to instruct the jury that they must take into consideration the fact that the landowners still owned all of the timber. If the value of the timber in the meanwhile had greatly enhanced, they would have suffered little, possibly no damage; if it had greatly depreciated, their damage would be material.

We are, therefore, of opinion that the last clause of plaintiffs' instruction No. 2 is erroneous, and in lieu thereof the court should have given defendants' instruction No. 2.

4. One clause of the contract provided that the lumbermen should "have the right to erect all buildings on said premises which they may deem necessary for their use in the manufacture and removal of said timber, said buildings to revert to the parties of the first part when the parties of the second part shall have finished the manufacture and removal of said timber, and the amount of lumber used in the construction of such buildings is to be deducted from the amount of timber measured during the current month."

As to this clause this controversy arose: The lumbermen undertook to deduct for the lumber that went into the houses $5.87 per thousand, which was the average price they had paid the landowners for all the logs, whereas the landowners undertook to prove that the value of the lumber which went into these houses was very much below the average, and hence that only the actual value thereof in the log should be deducted. We think that this latter contention is the correct one, and, therefore, that the court correctly instructed the jury on this point. The words in the contract "amount of lumber" and "amount of timber" should be construed to refer both to quantity and value.

5. Another point of controversy was that the lumbermen claimed that certain structures called "docks" should be construed to be buildings within the meaning of the contract. If they are such buildings, then the value of the lumber used for their construction is not to be paid for. It is claimed by the landowners that these docks, which appear to be platforms running out on a level with the mill floor upon which the lumber is taken on cars and stacked for the purpose of drying, are not buildings within the meaning of the contract, and hence that the logs from which the lumber was made out of which they were constructed should be paid for.

The amount involved is not large, but we think that these docks, constructed for the convenience of the lumbermen, and of no appreciable value to the landowners, cannot be considered as buildings, within the meaning of this contract, and hence that the landowners are entitled to be paid for the lumber used in their construction. If it is practicable to ascertain the value of such lumber, measured by the price at which the McCorkles were to pay for the logs which produced it, then this is the proper

measure of compensation therefor; if this value cannot be ascertained, then compensation should be fixed at the average value of the logs referred to.

The case has many complications, but upon the whole we are of the opinion that the trial court committed harmful errors against the plaintiffs in error (1) in its instruction to the jury as to the meaning of the language of the contract requiring the timber to be of sound, merchantable quality; (2) in giving plaintiffs' instruction No. 2 without modification; and (3) in failing to give the defendants' instruction No. 2, authorizing the lumbermen to set off against any damages which the landowners might have suffered the fair value to such landowners of the logs and trees which were left upon their land. Therefore, the verdict of the jury will be set aside, the judgment reversed, and the case remanded for a new trial in accordance with the views herein expressed.

*Reversed.*