𝕾𝖙𝖆𝖚𝖓𝖙𝖔𝖓.

## ADAMS V. HAZEN AND OTHERS.

September 19, 1918.

Absent, Burks, J.

1. SPECIFIC PERFORMANCE—*What Contracts will be Enforced.*—Where the contract is in writing it must contain all the essential elements of a valid executory contract—that is to say, competent parties, a legal subject matter, a valuable consideration and mutual assent—before it will be enforced in equity.

2. SPECIFIC PERFORMANCE—*Formal Contract to be Prepared.*—If the parties are fully agreed, there is a binding contract, notwithstanding the fact that a formal contract is to be prepared and signed; but the parties must be fully agreed and must intend the agreement to be binding. And if, though fully agreed on the terms of their contract, they do not intend to be bound until a formal contract is prepared, there is no contract, and the circumstance that the parties do intend a formal contract to be drawn up is strong evidence to show that they did not intend the previous negotiations to amount to an agreement.

3. SPECIFIC PERFORMANCE—*Discretion of Court.*—Every application for the specific performance of a contract is addressed to the sound discretion of the court, regulated by established principles.

4. SPECIFIC PERFORMANCE—*Contract—Proof—Terms.*—The contract must be distinctly proven, and its terms clearly ascertained. It must be reasonable, certain, legal, mutual, based upon a valuable consideration, and the party seeking performance must not have been backward in enforcing his rights, but ready, desirous, prompt and eager.

5. SPECIFIC PERFORMANCE—*Formal Papers to be Prepared—Case at Bar.*—A contract for the sale of timber contained the following provision: "Terms of sale half cash when transfer papers are properly gotten up, and remainder to be settled by note payable six months from date."

*Held:* That, construing this clause, along with the whole instrument, its language was not ambiguous and plainly referred. only to such formal papers as were necessary to carry the

contract into effect. The further papers to be executed by the parties were not to be of an *executory* character, in so far as the contract in question was concerned, but were to consummate and carry into effect, that contract—to execute that contract, to the extent of making a "transfer" or conveyance to the vendee in accordance with his rights under such contract. The contract was, therefore, not such an incomplete and tentative contract as a court of equity would decline to specifically execute.

6. SPECIFIC PERFORMANCE—*Intention—Meeting of Minds—Construction of Contract.*—A written contract for the sale of "all merchantable timber" upon a certain tract of land is in itself conclusive that there was a meeting of the minds of all the parties thereto in its use of the words "all merchantable timber" as descriptive of the timber sold and purchased. What may be the proper construction of that language is a wholly different matter. If it has a certain and definite meaning, which may be ascertained by established methods of construction of the provisions of contracts, that is sufficient, in so far as the validity of the contract in that particular is concerned. These questions of construction arise in a majority of cases that come before the courts for the interpretation and enforcement of contracts, but are never considered as grounds for cancelling the instrument.

7. TREES AND TIMBER—*Merchantable Timber.*—In a contract for the sale of "all merchantable timber" upon a certain tract of land, "merchantable timber" is all timber—whatever its size—that had, at the date of the contract, or may have during the life of the contract, a commercial value in that locality, for the purpose of manufacture into lumber, or for any other purpose. Hence the term "merchantable" used in such contract is one that the law can define, and the contract in that behalf has "a legal subject matter."

8. TREES AND TIMBER—*Time for Removal of Timber—Specific Performance.*—It is well settled that where no time for the removal of timber is specified in timber contracts, the contracts will be construed as providing, by implication, for "a reasonable time" for such removal. A contract, therefore, for the sale of timber, which does not fix any time for the removal of the timber, is not incomplete, nor unenforceable, because of this omission.

9. TREES AND TIMBER—*Sale of Timber—Interest on Deferred Payments.*—The contract in the instant case provided that the note for the deferred purchase money should be made payable six months from date, *i. e.,* six months from the date of said contract of March 14, 1917, *i. e.,* it was to be made payable September 14, 1917. Had the note been executed in accordance

39

with such contract it would have borne no interest unless and until default had been made in its payment on its due date, September 14, 1917.

10. VENDOR AND PURCHASER—*Payment—Transfer Papers.*—A sale of timber provided for one-half cash payment "when transfer papers are properly gotten up."

*Held:* That a reasonable construction of the words "transfer papers properly gotten up" is that a conveyance in writing, properly acknowledged for recordation according to law, was within the contemplation of the parties.

Appeal from a decree of the Circuit Court of Lee county. Decree for defendants. Complainant appeals.

*Reversed.*

The bill of the appellant in this cause (complainant in the court below), seeks to compel the specific performance of an agreement in writing executed by both the appellant and appellee (defendant in the court below), which is in the words and figures following:

"This agreement, made and entered into this the 14th day of March, 1917, by and between T. T. Adams and R. S. Hazen, trustee.

"Witnesseth: For and in consideration of one dollar cash in hand, the receipt of which is hereby acknowledged, and other considerations hereinafter mentioned, said R. S. Hazen, trustee, agrees to sell to T. T. Adams for a consideration of six thousand five hundred dollars all the merchantable timber on that portion of the Herndon tract of land lying in Lee county, Va., said portion described as follows: All the merchantable timber on that portion of said tract lying south of the creek paralleling the Virginia and South Western Railway and all the merchantable timber with the exception of the oak on that portion of said tract lying north of the creek paralleling the Virginia and South Western Railway including the water shed on north side of said creek extending to the top of the ridge or chain of mountains as they meander.

"Terms of sale half cash when transfer papers are properly gotten up and the remainder to be settled by note payable six months from date. It is further agreed that said Adams shall have without costs to him all right of ways over any part of the above described land in removing this timber as well as free use of land that might be required for mill sites for milling the timber and sidetracts on land. Said Adams can also mine from this property what coal he required to run his machinery while operating his timber at a cost to him of twenty-five cents per ton in excess of ten cars of forty tons each, said ten cars to be donated to the said Adams.

(Signed)            "T. T. ADAMS,

(Signed)            "R. S. HAZEN, Trustee."

The bill alleges that the land, on which the timber covered by said writing and also certain coal were located, was owned at the time such writing was executed by the defendant "as trustee for himself and other parties: that while the owners desired to sell both the coal and timber, they finally consented to dispose of the timber apart from the coal, and left the matter entirely in the hands of said defendant to handle as he saw fit;" and quotes from a letter from defendant to complainant, of date January 23, 1917, in which defendant says:  " * * * Now that I have gotten the owners of this property to agree with my idea about selling the timber, I see no reason why you and I should not be able to make a satisfactory deal with one another."

The bill contains the following other quotations from correspondence between the complainant and defendant prior to March 14, 1917, on which date the agreement in writing aforesaid was executed, and makes the following allegations in that connection, viz:

"On February 2, 1917, defendant again wrote to complainant as follows:

" 'It is not possible for me to give you an opinion in regard to the value of the timber in question, for I have never been over that tract of land, and even though I had my practical knowledge of this character of business is not sufficient to enable me to form a correct conclusion as to its worth.

" 'I was offered sometime since $3,500.00 for all the merchantable timber on this tract of land, and the owners of the property refused to consider it. I have also been offered $3.50 per thousand for the hemlock and chestnut; $5.00 for white oak, and $6.00 for yellow oak; $8.00 to $10.00 for poplar on the stump. Now, of course I do not know for the reasons stated above, whether or not these are reasonable offers, neither have I been able to ascertain the reliability of the parties making the offer.

." 'What I want you to do is to look over the property and make me the best offer you possibly can for I feel that you can afford to give as much as anyone, and I can place confidence in your report. Some of this timber has been damaged by fires, but to what extent I do not know.'

"In reply to this letter complainant wrote:

" 'I note that you state that sometime since, you were offered $3,500.00 for all the merchantable timber on this tract; and just right here, if you will allow me to make you a suggestion, I will say, that I would not sell all of the merchantable timber on the tract, from the fact that mine props are merchantable timber, and the party working the coal on your property could use the mine props to advantage. In my judgment, it would be to your interest to sell the timber running from ten inches to eleven inches and over in size, stump high. Such timber would be too large for mine props, and would really be of no benefit to anyone mining coal, whereas if this timber remains as it is, it is liable to be damaged considerably, or its value largely diminished, in consequence of the forest fires in that section

every fall and spring. I mention this, since I wish to say to you that I will examine the timber on the property and make you a proposition for it, of so much money for the timber running say ten inches in diameter three feet above the ground.

" 'It is my intention to examine this property somewhere between the 20th of this month and the first of March, if I can conveniently make arrangements to do so.'

"After this correspondence, complainant made a personal examination of the timber, and on March 14, 1917, the following contract in writing was made between him and the defendant."

(Here the bill contains a copy of the writing above given.)

The bill thereupon contains the following allegations with respect to what occurred touching said agreement after it was executed as aforesaid, viz:

"Second: On March 26, 1917, the defendant wrote complainant as follows, from Knoxville, Tenn., where he lives and is engaged in business:

" 'I have been very busy since you were here, and my attorney being out of the city, I have not had an opportunity of having our contract written up, but will have it attended to within the next few days and forward it to you.

" 'I find out that I sold you the merchantable timber in question a little too cheap, but I trust the good trade you made will encourage you to assist me in disposing of the coal property.'

"Complainant replied to this letter on March 28, 1917, as follows:

" 'I note that you have been very busy since I saw you last, and that your attorney has been out of the city, and you have not had opportunity to have contract written up, I will say you need not inconvenience yourself in any way about this matter. I would like to have the business closed

up at any time it suits you. I suppose you have abstract of title of this property, and I would like to look over this and would thank you to send it to me.'

"On March 28, 1917, defendant wrote complainant as follows:

" 'I herewith enclose contract and note. I trust the contract as drawn by my attorney will meet with your hearty approval.

" 'It has always been my understanding, and I have been informed by several timber men in and around Pennington Gap, Va., that the term "merchantable timber" means all timber measuring fourteen inches, and upward, in diameter two feet from the ground, which can be sawed up into some merchantable lumber.

" 'Nothing was said in regard to the length of time you were to have in which to remove the timber, and my attorney stated it was very essential for this to be stated clearly in the contract, and I assumed it would take you probably twelve months to remove the timber, and instructed him to make the time eighteen months, as I am anxious to give you all the time required without putting you to any great amount of inconvenience.

" 'You can sign copy of contract and return to me, with check for $3,250.00, also note for like amount due six months after date, with interest.

" 'The more information I get on the amount of timber on the boundary included in your contract, the more fully convinced I am of the big bargain I gave you. I hope you will make enough money out of this trade to organize a big mining company and let me lease you my coal land at a reasonable royalty.'

"Third: Complainant shows unto your honor that the communication last mentioned from defendant was a great surprise to him, in that it sought to change the written contract between them in two important particulars: ·

"(1) In substituting for the term 'merchantable timber' the words 'all timber measuring fourteen inches, and upward, in diameter two feet from the ground, which can be sawed up into sound merchantable lumber.'

"(2) In endeavoring to limit the time within which the timber should be removed, to eighteen months—there being no limit to such time in the written contract. Complainant shows unto your honor that, when any time is specified in such contracts, it is usual among purchasers of timber to stipulate at least five years for the removal thereof; and he is advised that where no time is specified, 'a reasonable time,' to be determined by all the evidence in the case, is allowed by law for the performance of the contract.

"Fourth: Complainant shows unto your honor that, because the contract sent to him by the defendant varied from the contract of March 14, 1917, in the same important particulars mentioned above, he declined to sign the same, and on April 13, 1917, mailed to defendant a formal contract in duplicate, duly signed and acknowledged by him for record, imbodying the precise terms of said contract of March 14, 1917. This contract defendant was requested to execute as trustee, and also to have the same signed, but not acknowledged, by all parties for whom he was such trustee, in order to show of record their approval of sale. Defendant was requested after the execution of said contract as aforesaid, to attach a draft for $3,250.00 to the same and forward it, through his bank, to complainant that being the cash payment provided for by said contract of March 14, 1917; and to send instructions with said contract and draft allowing complainant to examine the instrument before honoring the draft, but not to remove it from custody of the bank until the draft had been paid; and complainant added in his letter to defendant on this subject:

"'Then I would promptly forward to you by mail my six months' note for $3,250.00, or if this mode of cash payment

and mailing you note is not satisfactory, I will be glad to adopt any plan or suggestion you may have to make.'

"But as complainant shows unto your honor, the defendant declined to execute said contract and wrote to complainant on April 17, 1917, asking for his understanding of the phrase 'merchantable timber.'

"On April 25, 1917, complainant wrote defendant as follows:

" 'I have your favor of the 17th inst., and note you wish to know what my understanding is with reference to the phrase "merchantable timber."

" 'I will say that merchantable timber means all timber that can be sold. Any timber that cannot be sold, naturally is not merchantable. There was a case of this sort brought up in the courts in Tazewell county, Va., and the courts held that any timber on the property that could be sold was merchantable, and that portion, if any, that could not be sold naturally was not merchantable. It has always been my understanding that merchantable timber means exactly what it says, and I do not see how any other construction could be put upon it. As I understand it, all timber that is salable and can be sold is merchantable; otherwise it is not merchantable.

" 'I virtually stated this to you in my letter of February 6th, before I had ever gone over the property to investigate the timber. By referring to that letter, you will notice I stated in the first paragraph as follows:

" 'I will say that I would not sell all of the merchantable timber on the tract, from the fact that mine props are merchantable timber, and the party working the coal on your properties could use the mine props to advantage."

" 'Now before going to investigate this timber, my idea was to make you an offer on it running ten inches and over in size, but after going there and examining the properties, I saw that you would have plenty of timber on that portion

of the property that I would not be interested in, for mining purposes; and again, upon examining the hemlock I noticed that it was straight and the trees could be worked to a very small size in making framing. Therefore, I decided after this examination, on going to see you that I would make a proposition covering the merchantable timber on that portion of the property that I would like to buy, which I did. No doubt, you will recall the conversation I had with you the morning I arrived in Knoxville, when I stated in your office that some of the hemlock timber could be worked as low as six inches in size.

" 'I merely mention these facts now to show you that it was certainly not my intention to take any undue advantage in any way, so far as using terms in connection with timber with which you were familiar, was concerned, and I certainly tried to make myself clear to you about these matters.

" 'With reference to the time of removal I am not able to say how long a time I would want with reference to taking the timber from the property. It might be that war conditions will affect the market price of lumber either favorably or very unfavorably, and I would not want to be bound under any stipulated time for removal. It would of course naturally be to my interest to remove it as soon as I could do so to advantage myself, since it does not pay me anything standing there, with interest on the investment accruing.

" 'As stated in my letter of the 13th inst.—The contract in duplicate I enclosed to you carried out the literal informal agreement in writing signed by you as trustee, as well as myself, on March 14, 1917. That agreement is binding on both parties, and certainly could not be altered without mutual consent. Now, so far as I am concerned, I do not want this contract of sale altered in any way. I trust now that I have made myself entirely clear to you; otherwise, shall be glad to hear from you further about these matters.'

"On May 7, 1917, defendant wrote complainant as follows:

" 'Mr. T. T. Adams,

Richmond, Va.

" 'Friend Tom:

" 'I laid your last letter before the owners of the timber in question and they all stated that their understanding of the term "merchantable timber" meant all timber measuring fourteen inches in diameter and upward, two feet from the ground that could be sawed into sound, merchantable lumber:

" 'They also stated that they *left* the length of time I agreed to give you to remove the timber was reasonable and would be so construed.

" 'I regret this misunderstanding, and I feel that you are just as sincere in your understanding of the term as we are, but while this may be true, it will not be possible for us to arrive at any definite conclusion in this matter, unless we can affect amicably a compromise.

" 'There are several parties who wish to buy this timber, and if you are not willing to change your views in regard to the terms in question, I will then have to ask you to cancel the contract.

" 'Now Tom, if you feel that you have just grounds for bringing suit against me, as trustee, for breach of contract, you must not allow our personal and social relations to interfere with your making an honest effort to protect your own interests.'

"In consequence of this letter, complainant has felt compelled, much to his regret, to bring this suit for the protection of his interests. For complainant is advised and charges that the contract in writing of March 14, 1917, between him and the defendant is a valid contract, binding on the defendant and all those represented by him as trus-

tee, which a court of equity will not permit to be altered without his consent, but will require to be specifically executed by the parties; that the phrase 'merchantable timber' used therein means all timber that is or can be made an article of merchandise; and that the words 'merchantable timber' in said contract cannot be substituted by the words 'all timber measuring fourteen inches and upwards two feet from the ground, that could be sawed into "merchantable timber"' without complainant's consent; that as no time was specified in said contract of March 14, 1917, for the removal of the timber, defendant cannot require complainant to limit the time for removal of said timber to eighteen months by inserting such limit in the contract, but that the complainant must be allowed a 'reasonable time' under all the circumstances of the case for such removal.

"Complainant further shows unto your honor that he is not advised who are the precise persons represented by R. S. Hazen, trustee, in said contract of March 14, 1917.

"Complainant further shows unto your honor that he is, and has always been ready, anxious and willing to perform all the obligations resting on him under said contract of March 14, 1917, and especially to pay the purchase price for the merchantable timber mentioned therein in the manner required by said contract; that nothing was said in said contract about interest on the six months' note provided for therein; that the note sent to complainant by said R. S. Hazen for his signature likewise demanded no interest and was as follows:

" 'Knoxville, Tenn., March 14, 1917.
" 'On or before,
" 'Six months after date I promise to pay to the order of R. S. Hazen, trustee, thirty-two hundred and fifty and no/100 dollars, for value received, payable at the office of Hazen, Trent & Harrell Company, 127 Jackson street, Knoxville, Tennessee.

" 'The undersigned principal, and the endorsers of this note which is filled up before signing, agree that if this note is placed in the hands of an attorney-at-law for collection, or has to be sued on, that they will pay ten per cent. attorney's fees, in addition to the principal, which shall be added to and become a part of the judgment.

" 'No......... Due'............

.....................,'

"But that complainant has consented to pay interest on said note if the defendants will execute a proper contract for recordation."

The bill thereupon concludes in the usual form (except that it does not waive an answer under oath), making the appellee a party defendant; containing the prayers that "if deemed necessary or advisable the said Hazen may be required to disclose herein the names and addresses of the persons represented by him as the trustee as aforesaid and that they may be made parties defendant hereto; that said Hazen and the parties represented by him as trustee as aforesaid may be required specifically to execute and perform said contract of March 14, 1917; that said Hazen and said parties represented by him as such trustee may be required to reduce said contract to proper form for recordation in the clerk's office of Lee county; that proper process may issue * * *," etc., etc.

The defendant demurred to the bill. Such demurrer was sustained by the court below and the decree complained of was entered dismissing the bill.

The following grounds of demurrer were assigned in the court below and are relied upon by the defendant here, viz:

"The defendant, R. S. Hazen, in his own right, and as trustee, says that complainant's bill in this cause is not sufficient in law.

"The grounds for said demurrer are as follows:

"First: Because the alleged contract of March 14, 1917.

and sought to be enforced herein, is an incomplete and tentative contract, and being such contract, a court of equity will decline to specifically execute it.

"Said alleged contract contains the following provisions and stipulation:

" 'Terms of sale half cash when transfer papers are properly gotten up and the remainder to be settled by note payable six months from date.'

"From said provision and stipulation, it clearly appears that all the negotiations had not been concluded, but on the contrary it clearly appears therefrom that a subsequent and more formal agreement was intended to be entered into in which new and additional terms were to be introduced, not contained in the former agreement. In such case, the first agreement is not binding: The court will refuse to act even when it only rests reasonably doubtful whether what passes between the parties was conclusive, or still in treaty, no matter how near the parties may seem to have reached a final agreement.

"Second: Because the allegations of said bill, show that said alleged contract of said date, is not certain and definite in all its parts, and also the said allegations show, that the terms of said contract are not certain, definite or mutual.

"When the parties submitted to each other the subsequent agreements or contract as contemplated by said tentative agreement to be drawn up and executed by the parties, a different interpretation is and was put upon the terms used therein by them respectively.

"In said case the rule is as follows:

" 'Where the court is unable from all the circumstances of the case, to say whether the minds of the parties met upon all the essential particulars, or if they did, they can not say exactly upon what substantial terms they agreed, or trace out any particular line where their minds met. specific performance will be refused.'

"Third: Because the allegations of said bill show, that complainant is seeking to have specifically executed an alleged contract not contemplated or understood and not authorized by the beneficiaries or owners of the property, and which they refused to approve. All of which is and was known to complainant before the institution of this suit.

"Fourth: Because the term 'merchantable' used in said alleged contract of March 14, 1917, is not one that the law can define.

"Fifth: Because the allegations of said bill show, that to decree specific performance of said alleged contract, being only a tentative one, the court would have to do one of two things, either

"(a) To compel the defendant to part with property not contemplated or intended to be contracted by him, or

"(b) To compel the complainant to receive and take property not contemplated or intended to be purchased by him.

"To do either would be for the court to make a contract for the parties, which it will not do.

"The rule as understood in such cases is:

"'If the description of the property, the subject matter of the sale, or the terms of the contract are ambiguous so that one party may have reasonably made a mistake as to the subject matter for the terms of the contract, or may have reasonably put a different construction on the contract from that which was contemplated by the other, the court will not assist either of them in enforcing the contract against the other.'

"Sixth: Because the allegations of said bill show that said tentative contract does not fix the time for the removal of the timber, and that the parties have failed to do so under the proposed, subsequent contract, or to settle the question of interest on the deferred purchase money as was contemplated by them in the said tentative contract.

"Seventh: Because the said allegations of the said bill show that the parties have not made a complete and final contract in writing for specific execution, and that there is no such contract alleged in said bill that can be specifically executed."

*Eugene C. Massie,* for the appellant.

*B. H. Sewell,* for the appellees.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court.

The authorities have long since settled what character of executory contract a court of equity will enforce by requiring specific performance of it. Where the contract is in writing it must contain "all the essential elements of a valid executory contract—that is to say, competent parties, a legal subject matter, a valuable consideration and mutual assent. Minor's Inst. Pt. I (1st ed.), p. 16"; *Hairston* v. *Hill,* 118 Va. 339, 342, 87 S. E. 573, 575. "The whole question is one of intention. If the parties are fully agreed, there is a binding contract, notwithstanding the fact that a formal contract is to be prepared and signed; * * *." *Boisseau* v. *Fuller,* 96 Va. 45, 46, 30 S. E. 457. It is also true, as urged in behalf of the appellee, that "the parties must be fully agreed and must intend the agreement to be binding." (And) "if, though fully agreed on the terms of their contract, they do not intend to be bound until a formal contract is prepared, there is no contract, and the circumstance that the parties do intend a formal contract to be drawn up is strong evidence to show that they did not intend the previous negotiations to amount to an agreement. Clark on Contracts, p. 38." *Boisseau* v. *Fuller, supra,* 96 Va. pp. 46-7, 30 S. E. 457. The writing is not a contract

if it is "a mere memorandum of incomplete negotiations in which the minds of the parties never met and from which either party could recede at will." *Hairston* v. *Hill, supra,* 118 Va. p. 342, 87 S. E. 575. See also, to same effect, Pom. Spec. Perf. pp. 81-89; *Berry* v. *Wortham,* 96 Va. 87-89, 30 S. E. 443; cases cited 12 Michie's Dig. Va. & W. Va. Cas. 514; Tyron Spec. Perf. of Contracts, New Am. Ed. 230-342; *Graham* v. *Call,* 5 Munf. (19 Va.) 396; *Milnes* v. *Gray,* 14 Ves. (Jr.) 400; *Baker* v. *Glass,* 6 Munf. (20 Va.) 212; *Huddleston* v. *Briscoe,* 11 Ves. (Jr.) 592; *Hinchman* v. *Ballard,* 7 W. Va. 152; *Clinchfield Coal Corp.* v. *Powers,* 107 Va. 393, 59 S. E. 370; *Creecy* v. *Grief,* 108 Va. 320, 322-3, 61 S. E. 769. As said by Jessel, N. R., in *Winn* v. *Bull,* 7 Ch. Div. 27-32 (quoted with approval in *Boisseau* v. *Fuller, supra,* 96 Va. at page 47, 30 S. E. 457: "It comes therefore, to this, that where you have a proposal or agreement made in writing expressed to be subject to a formal contract being prepared, it means what it says; it is subject to and dependent upon a formal contract being prepared. Where it is not expressly stated to be subject to a formal contract, it becomes a question of construction whether the parties intended the terms agreed on should merely be put into form, or whether they should be subject to a new agreement the terms of which are not expressed in detail." See to same effect *Harrison* v. *Parmer,* 76 Ala. 157, also cited and quoted from with approval in *Boisseau* v. *Fuller, supra,* 96 Va. at pages 47-8, 30 S. E. 458. And, "every application for the specific performance of a contract is addressed to the sound discretion of the court, regulated by established principles. The contract must be distinctly proven, and its terms clearly ascertained. It must be reasonable, certain, legal, mutual, based upon a valuable consideration, and the party seeking performance must not have been backward in enforcing his rights, but ready, desirous, prompt and eager." *Darling* v. *Cumming's Ex'r,* 92 Va. 525, 23 S. E. 881.

In the light of the general principles established by the authorities, some of which are above referred to, we come now to consider and dispose of the questions arising from the positions taken by the appellee in the cause before us, in their order as stated below.

1. The 1st, 2nd, 5th and 7th grounds of demurrer, all raise one and the same questions, namely:

What is the true construction and effect of the following clause in the written instrument of March 14, 1917, sought to be enforced as a binding contract, to-wit:

"Terms of sale half cash when transfer papers are properly gotten up, and remainder to be settled by note payable six months from date"?

Construing this clause, along with the whole instrument, we are of opinion that its language is not ambiguous and plainly refers only to such formal papers as were necessary to carry into effect the contract of March 14, 1917. The case before us is not, in truth, one where a further *executory* contract between the parties was contemplated by them. The only further "papers" which were to be executed by them, as expressly stated in the contract of March 14, 1917, were "transfer papers * * * properly gotten up" and a "note (of appellant) payable six months from date" for the deferred payment of one-half of the purchase money for the timber. That is to say, the further papers to be executed by the parties were not to be of an *executory* character, in so far as the contract in question was concerned, but were to consummate and carry into effect that contract—to execute that contract, to the extent of making a "transfer" or conveyance to the appellant in accordance with his rights under such contract. It was the same thing in effect as if the contract of March 14, 1917, had provided that the appellee should make to the appellant a good and sufficient deed of conveyance of the timber purchased as set forth in such contract, properly executed to carry such

41

contract into effect and that appellant, upon the date of delivery to him of such conveyance, should pay to appellee one-half of the purchase money for the timber provided for in the said contract in cash and that appellant should, at the same time, execute and deliver his note to appellee for the remainder of such purchase money payable six months from the date of March 14, 1917, contract.

2. The third ground of demurrer takes the position that the refusal of the appellee and his co-owners to execute the contract of March 14, 1917, unless the words "all merchantable timber" be given a meaning of "all timber measuring fourteen inches in diameter and upward, two feet from the ground, that could be sawed into sound, merchantable lumber," evidenced that there was not a meeting of the minds of the parties to the contract of March 14, 1917, in its use of the words "merchantable timber."

We are of opinion that this position is not well taken. The contract is in itself conclusive that there was a meeting of the minds of all the parties thereto in its use of the words "all merchantable timber" as descriptive of the timber sold and purchased. What may be the proper construction of that language is a wholly different matter. If it has a certain and definite meaning, which may be ascertained by established methods of construction of the provisions of contracts (as we shall presently see it has), that is sufficient, in so far as the validity of the contract in that particular is concerned. As said by this court in *Hairston* v. *Hill, supra,* 118 Va. 339, 87 S. E. 573: "These questions of construction arise in a majority of cases that come before the courts for the interpretation and enforcements of contracts, but are never considered as grounds for cancelling the instrument."

So far as appears from the bill none of the co-owners with appellee have questioned the general authority or power of the latter to enter into the contract of March 14,

1917. Their minds met the mind of appellant to the extent of entering into such contract. They differed with the mind of appellant only upon the construction of the terms used in the contract.

3. The fourth ground of demurrer takes the position that the term "merchantable" used in the contract of March 14, 1917, is not one that the law can define.

We are of opinion that this position is not well taken.

In *Ragland* v. *Butler*, 59 Va. (18 Gratt.) 323, this court held that the language of a contract, "merchantable * * * timber" bought for the purpose of manufacture into lumber, had a definite meaning which the law can define. It was there held that "merchantable timber" as those words were used in that contract, was such timber as could be manufactured into lumber marketable at the place of delivery of the lumber specified in the contract.

In *Stuart* v. *Pennis*, 91 Va. 688, 22 S. E. 509, the contract was for "merchantable timber at $3.00 per tree" of certain size. Upon consideration of the demurrer to the bill for specific performance of the contract this court said: "There was and could be no objection urged against the relief sought growing out of any indefiniteness as to the terms of the contract or as to its subject matter."

In *McCorkle & Son* v. *Kincaid*, 121 Va. 546, 93 S. E. 642: "Where timber was bought for manufacture into lumber, this court held that "sound merchantable logs, as those words are used in the contract under consideration, are logs that have a commercial value for manufacture into lumber, and such as are ordinarily used for that purpose in that locality."

We are of opinion, that in the instant case, in which the contract does not limit the purpose for which the timber was bought, beyond the stipulation that it must be "merchantable," "all merchantable timber," as those words are used in the contract under consideration, is all timber—

whatever its size—that had, at the date of the contract, or may have during the life of the contract, a commercial value in that locality, for the purpose of manufacture into lumber, or for any other purpose. Hence the term "merchantable" used in such contract is one that the law can define, and the contract in that behalf has "a legal subject matter." (As stated in the contract, the oak, on one portion of the land mentioned and described in the contract, is excepted from the timber sold and purchased as per such contract.)

4. The sixth and only remaining ground of demurrer stated in the court below or urged before us is that the contract of March 14, 1917, was incomplete and non-enforceable because (a) it does not fix any time for the removal of the timber or (b) settle the question of interest on the deferred purchase money.

Taking up these positions in their order, as stated:

(a) It is well settled that where no time for the removal of timber is specified in timber contracts, the contracts will be construed as providing, by implication, for "a reasonable time" for such removal. *Wright* v. *Camp Mfg. Co.*, 110 Va. 678, 66 S. E. 843; *Carpenter* v. *Camp Mfg. Co.*, 112 Va. 300, 71 S. E. 559; *Brown* v. *Surry Lumber Co.*, 113 Va. 503, 508, 75 S. E. 84; and authorities cited in such cases. The contract in the case before us, therefore, was not incomplete, as it must be regarded in a court of equity (or at law, for that matter), nor unenforceable, because of the omission in question.

(b) The contract does settle the question of interest on the deferred purchase money. It is specific in its provision that the note for such deferred purchase money should be made payable "six months from date," *i. e.,* six months from the date of said contract of March 14, 1917, *i. e.,* it was to be made payable September 14, 1917. Had the note been executed in accordance with such contract it would have borne no interest unless and until default had been

made in its payment on its due date, September 14, 1917. And, as appears from the allegations of the bill, such was also the appellee's construction of the contract, as evidenced by the form of note he sent appellant to execute.

5. However, should it develop in the further progress of this cause that the allegations of the bill are sustained by a preponderance of the evidence and decree on the merits of the cause be entered in favor of appellant enforcing specific performance of said contract of March 14, 1917, we are of opinion that no interest should be decreed against appellant prior to the entry of such decree, but such decree should provide for the payment by appellant of the principal of the whole of the purchase money aforesaid upon the execution and delivery to him of such a conveyance to him of the timber purchased, as set forth and described in said contract, as is demanded in the bill, duly acknowledged for recordation according to law. In which case, of course, should there be any delay in the payment by appellant of such purchase money at the time required by such decree it would all bear interest from such time.

6. With regard to the requirement, that such a deed as is in the bill demanded, duly acknowledged for recordation according to law, should be executed by appellee and his co-owners; we are of opinion that a reasonable construction of the language of the contract—"transfer papers properly gotten up"—is that such language carries with it the meaning that a conveyance in writing such as aforesaid, properly acknowledged for recordation as aforesaid, was within the mutual meaning and contemplation of both parties to such contract.

7. No question is raised in this cause upon the demurrer to the bill, as to the existence of the other requisites to entitle the appellant to specific performance of the contract, namely, as to there having existed competent parties to, a valuable consideration for the contract, and that the appel-

lant "has not been backward in enforcing his rights but ready, desirous, prompt and eager" and able to comply with all the terms of the contract on his part.

On the whole, therefore, we are of opinion that the court below was in error in sustaining the demurrer to the bill in this cause and the decree complained of will, therefore be set aside and annulled and this cause will be remanded to the court below for further proceedings to be had therein not in conflict with the views expressed in this opinion.

*Reversed.*