Argued May 6, affirmed as modified September 6, petition for
rehearing denied October 1, 1957

# DOHERTY ET UX v. HARRIS PINE MILLS, INC.

315 P. 2d 566

*Willis A. West,* Portland, argued the cause and filed a brief for appellants.

*George H. Corey,* Pendleton, argued the cause for respondent and cross-appellant. With him on the brief was P. W. Mahoney, Heppner.

Before LUSK, J., Presiding and BRAND, WARNER and KESTER, Justices.

BRAND, J.

Plaintiffs Doherty brought this action to recover from the defendant company, Harris Pine Mills, Inc., damages for timber trespass. The amended complaint alleges that the plaintiffs at all times therein mentioned were the owners as tenants by the entirety and in possession of real property fully described therein. Plaintiffs allege

"That on or about May 1, 1953, the said defendant, its officers, agents and employees, entered upon said real properties and did thereafter, without lawful authority, wilfully and intentionally, cut down and remove 4,008,465 board feet of pine timber standing and growing on plaintiffs' said described real properties belonging to plaintiffs, said timber having a reasonable value of $144,304.74, to plaintiff's damage in the sum of $144,304.74."

Plaintiffs pray for judgment in treble the amount named.

The defendant company answered, denying any alleged trespass. It also filed four other pleas, (1) in abatement, (2) in estoppel, (3) for reformation of contract, and as its fourth plea defendant filed what it described as an answer "by way of counterclaim for declaratory judgment." It was stipulated that all issues be heard and decided by the court without the empaneling of a jury. The court first took the testimony offered by the defendant relative to the so-called counterclaim for declaratory judgment, and relative to the alleged estoppel and plea for reformation. Defendant rested and the plaintiffs presented their case. The court made findings of fact and conclusions of law and rendered judgment against the plaintiffs. It denied the defendant's pleas in abate-

ment, estoppel and reformation, and on the so-called counterclaim for declaratory judgment, entered a declaration and judgment favorable to the defendant, the nature of which will be stated infra. The plaintiffs appeal from the adverse judgment, and the defendant cross appeals from those portions of the judgment which denied defendant's plea in abatement and plea for reformation. Bills of exceptions presented the trial court by both parties were settled and allowed.

The controversy relates to the interpretation or construction of a contract for the sale and purchase of timber on lands belonging to the plaintiffs. The contract is set forth in full in the plea in abatement and is incorporated by reference in the pleas in estoppel, for reformation and for declaratory judgment. We shall not refer further to the plea in estoppel because the court denied relief on that ground and defendant did not appeal from that portion of the judgment. We now set forth all of the contract except some portions which have no bearing upon the issues:

"THIS AGREEMENT made and entered into this 4 day of May, 1943, by and between Charles McDevitt, hereinafter called the Seller, and Harris Pine Mills, Inc., an Oregon corporation, hereinafter called the Purchaser, WITNESSETH:

"This contract is made in lieu of and as a substitute for that contract for the sale of the timber hereinafter described made on the 2nd day of December, 1940, by and between the same parties as the parties to this agreement.

"That the parties hereto, for and in consideration of the mutual covenants herein contained, hereby agree with each other as follows:

"The Seller does hereby agree to sell and the Purchaser does hereby agreed to buy, cut and remove from the premises hereinafter described all

of the following merchantable pine and fir timber located on the following described premises, the same to be trees which will cut logs the tops of which must be ten inches in diameter.

"It is agreed that the timber of the hereinafter described real property has been cruised, and that the parties have agreed on the number of board feet upon each tract of land, and that the tracts upon which the timber so sold and purchased and the amount of the timber on each tract is as follows:

"MORROW COUNTY — TOWNSHIP 4 SOUTH, RANGE 29, E.W.M.

"Tract 1.  12—40's  (described)—434,000 board feet of pine

"Tract 2.   6—40's  (described)—1,015,000 board feet of pine

"Tract 3.  12—40's  (described)—1,505,000 board feet of pine

"Tract 4.   6—40's  (described)—925,000 board feet of pine.

"TOWNSHIP 4 SOUTH, RANGE 30, E.W.M.

"Tract 5.   2—40's  (described)—165,000 board feet of pine

"Tract 6.  All of Section 7.—1,133,000 board feet of pine.

"Tract 7.   5—40's  (described)— 39,000 board feet of pine

"Tract 8.   8—40's  (described)—1,485,000 board feet of pine

"The Purchaser does hereby agree to pay for the said pine timber at the rate of $1.75 per thousand board feet.  In this connection, it is agreed that the total amount of timber agreed to be sold and purchased under this agreement is 6,701,000 board feet of pine timber and that the total purchase price for the pine timber located on the hereinabove described tracts of land is $11,726.75, which sum the Purchaser promises and definitely agrees to pay to the Seller.

"Purchaser does hereby agree to pay for the said fir timber at the rate of $1.25 per thousand board feet. In this connection, it is agreed that the total amount of fir timber agreed to be sold and purchased under this agreement is 25,000 board feet, and that the total purchase price for the fir timber located on the hereinabove described tracts of land is $31.25, which sum the Purchaser promises and definitely agrees to pay to the Seller. Upon the above purchase price the sum of $3,000.00 has heretofore been paid, the receipt whereof is hereby acknowledged.

"IT IS MUTUALLY AGREED that the Purchaser shall pay all of the purchase price for said timber on or before November 1, 1957, and shall pay any part thereof or all thereof within thirty days after the Seller shall have demanded payment by written demand.

"The Purchaser agrees that before entering upon any tract of land hereinabove mentioned for the purpose of cutting the timber thereon as herein provided, and before commencing to cut any timber on any tract as hereinabove described, that the Purchaser shall pay to the Seller the full purchase price for all of the timber located upon said tract of land as above mentioned, and in this connection the Purchaser promises and agrees not to move any timber thereon until the purchase price as above outlined has been paid in full.

"It is understood and agreed between the parties that the legal title to the above described timber shall remain in the Seller until the Purchaser has paid the purchase price as herein provided for, and in that connection it is further agreed that the Purchaser shall have no right, title or interest in or to any of the above described timber until the same has been paid for by the Purchaser as herein provided.

"The Purchaser is to cut only trees, the logs from which will measure ten inches or more at the top, and agrees not to molest or cut any pine or

other timber of smaller size than herein specified, and also agrees not to cut, molest or destroy any Tamarack or other timber located on the above described real property.

"The Purchaser agrees to pay for all of the timber hereby agreed to be sold on or before November 1, 1957, and unless paid for on that date all of the Purchaser's rights to the remaining standing timber on said lands on that date shall cease and terminate.

"It is further agreed that the Purchaser is to designate the tract of land upon which he is to start cutting, and that he shall not be entitled to cut any timber upon any separate tract of land hereinabove mentioned until he shall have paid the full purchase price for the timber located upon said separate tract of land to the seller and has secured Seller's written receipt therefor, designating the particular tract upon which the Purchaser has paid for. The Seller agrees to give the Purchaser a separate receipt for each payment, showing the description of the tract of land upon which the timber has been paid for by the Purchaser.

"It is further agreed that the Purchaser shall not permit any other person or persons to go upon said lands for the purpose of making wood out of the limbs and tops cut, or for any other purpose, without the written consent of the Seller, and in this connection, it is agreed that the limbs and the tops of all trees cut by the Purchaser shall be viewed as the property of the Seller.

\* \* \* \* \*

"In the event of the failure of the Purchaser to comply with any of the terms or conditions of this contract for thirty days after having been notified by the Seller of any default, the Seller may at his option terminate the contract and take possession of the premises and all timber located thereon, excepting only such timber as has been paid for by the Purchaser as herein specified, and in such event all rights of the Purchaser in timber

not then paid for shall immediately cease and
terminate, but nothing herein contained shall limit
any right or remedy that the Seller might other-
wise have against the Purchaser, and the Seller
does hereby retain unto himself any other right
of remedy either at law or in equity which he might
otherwise have under this contract. It is further
understood that Harris Pine Mills, Inc., or their
successors, shall have until November 1, 1957, in
which to log the above timber."

It is the contention of the plaintiffs that the fore-
going contract is definite and unambiguous. They
say first that the contract authorized the defendant
to cut and remove 6,701,000 feet of pine timber and
no more. Their second contention relates to the por-
tion of the contract which sets forth eight tracts of
timber land and purports to state the amount of tim-
ber on each tract. Plaintiffs assert that although
defendant could cut 6,701,000 feet of timber from the
eight tracts, it could not cut from any one tract more
than the amount of timber specified in the contract
as being on that one tract. It is alleged and admitted
that the defendant in the years 1953 and 1954 cut and
removed from Tracts 1 and 2 pine logs scaling
5,031,395 board feet. The contract sets forth the
amount of pine timber on Tract 1 as 434,000 feet and
on Tract 2 as 1,015,000 feet, or a total of 1,449,000
feet. It follows that according to the plaintiffs' con-
struction of the contract the defendant, as a trespasser,
unlawfully cut the difference in footage between
5,031,395 and 1,449,000, or a total of 3,582,395 feet
of pine timber. Plaintiffs' complaint charges that
defendant wrongfully cut 4,008,465 feet of pine tim-
ber, but in his opening statement, counsel for plain-
tiffs said:

"* * * The figure of 5,031,395 feet has been
pleaded, that there was 5,031,395 board feet taken

from the Tracts 1 and 2. Now, that is pleaded by the defendant. Now, insofar as the plaintiffs are concerned, we will use that figure as to the total amount of timber that was removed in 1953 and '54 from Tracts 1 and 2, and that the amounts received under the contract as we interpret it for each of these sections added together and subtracting them from the figure 5,031,395 feet would be the amount of overcut on those two sections [meaning tracts]   *   *   *."

Thus, under the plaintiffs' construction of the contract the defendant is liable for the cutting in trespass of 3,582,395 feet of pine timber although it had cut 1,669,605 feet less than the total amount which plaintiffs admit the defendant was authorized to cut from the eight tracts. Plaintiffs allege a value of $36 per thousand feet, which would amount to damages in the sum of about $129,000. Under the treble damage statute, the amount for which judgment would be entered for plaintiffs, if their interpretation of the contract is approved, would be about $387,000.

In each of its separate answers the defendant alleges that on 2 December 1940 Charles McDevitt was the owner of the real property described in the amended complaint and that on 4 May 1943 McDevitt, as owner, entered into the agreement set forth supra, "for the sale of the timber on said lands." It is further alleged that thereafter McDevitt sold the said real property to the plaintiffs, who on 6 December 1949 acknowledged that title to said real property was held by them subject to the contract of 4 May 1943 and the rights outstanding thereunder. It is alleged that defendant has paid the entire purchase price and fully and in good faith performed the agreement, and that in 1953 and 1954 defendant cut and removed from Tracts 1 and 2 pine logs measuring 5,031,925

board feet. (The transcript shows that the footage should have been stated as 5,031,395.) In its various answers and throughout the case the defendant has contended that the contract is ambiguous. In the "Counterclaim for Declaratory Judgment" it alleges

"V.

"That defendant construes said agreement to provide that the defendant as purchaser is entitled to cut and remove all of the merchantable pine timber on the described premises during the term of the agreement as extended. That the intention of the parties was that the sellers were selling to the defendant all of the merchantable pine timber growing on the premises and that the same was the subject matter of the contract and not a lesser amount.

"VI.

"That the contract, if not permitting the cutting and removal of all of the merchantable pine timber as aforesaid, does evidence an agreement to sell 6,701,000 board feet of merchantable pine timber from all of the described land. That the agreement should not be interpreted to restrict the defendant as purchaser to the amounts from each tract designated after the legal descriptioin thereof and that defendant should be permitted to take said total amount from any and all tracts."

The claims of defendant are made clear by its prayer, which is as follows:

"V.

"* * * * *

"WHEREFORE, defendant prays that all proceedings in the above entitled action be abated and that defendant be granted costs and disbursements herein, and if the action be not abated that plaintiffs take nothing by their complaint, and that the contract of May 4, 1943 be reformed to express

the intent of the parties that all of the pine and fir timber and growth thereof was sold to the defendant, and in the alternative, that a declaratory judgment be made and entered construing the agreement of May 4, 1943, as extended, and providing further that:

"(1) Defendant, under the provisions of said agreement, is entitled to cut and remove all of the merchantable pine timber from said premises during the term of said contract as extended or, in the alternative,

"(2) That defendant, under the provisions of said agreement, is entitled to take and remove 6,701,000 board feet of merchantable pine timber from Tracts 1 to 8 inclusive, irrespective of whether said timber originated on one or more tracts as therein set forth, and

"(3) That defendant is the owner of all of the merchantable pine and fir timber growing on said premises, subject to the terms and provisions of said agreement relating to the removal thereof."

In the plea in abatement the defendant further alleged that the agreement of 4 May 1943 "operated as a conveyance of an undivided interest in the whole and the defendant is thereby a tenant in common with the plaintiffs", and defendant asserts that the action is premature and that the plaintiffs must first seek an accounting, and it asserts that an action at law for damages does not lie between co-tenants.

Plaintiffs replied to the plea in abatement and set forth their interpretation of the contract as outlined supra in this opinion. Their conclusion was that since defendant cut from Tracts 1 and 2 more than the footage set forth in the contract as being on those tracts, the defendant was a trespasser as to the excess. Plaintiffs also denied that defendant had fully performed the contract, and alleged that "any cotenancy

existing between the parties under said agreement * * * has been fully terminated."

Before going to the merits, we will consider the defendant's plea in abatement. Briefly stated, the defendant's claim is that the agreement operated as a conveyance of a specified amount of timber less than the entire amount standing on the lands described, and that the parties thereby became tenants in common under the doctrine of *Seguin v. Maloney-Chambers,* 198 Or 272, 253, P2d 252, 256 P2d 514. In that case there was an outright conveyance of a specified quantity of standing timber from a described tract of land on which more than the specified footage was then standing. The purchaser paid the full price. This court said:

"The more modern rule, and the one which we believe is the better and more equitable, is that where there is a conveyance of a stated acreage or other designated quantity of land out of the larger tract, without particularly attempting to locate or describe the smaller tract, the conveyance operates as an undivided interest in the whole. The rule is thus stated:" Citing *Hodge v. Bennett,* 78 Miss 868, 29 So 766; Annot. 117 ALR 1081.

The court also said:

"It may be argued that the conveyance thus construed creates a condition where the parties to the conveyance are tenants in common, and neither could remove the timber thereon without proper partition." 198 Or at 282.

However, we said:

"Thus, the effect of the implied terms of the agreement in such a transaction is that the vendee may go upon the land and remove that portion of the whole which he has purchased; as effective a partition as could be granted in a court of equity." 198 Or at 283.

■ The decision in *Sequin v. Maloney-Chambers* suggests that the vendor and vendee *may* sometimes be held to be tenants in common, but it does not support the claim of defendant here that the action should be abated. In the instant case there was no absolute conveyance of timber as in Seguin's case, but only an agreement to sell and purchase. In the pending case the contract expressly provides that title shall remain in the seller until the purchaser has paid the purchase price. We know of no rule which makes such a vendee in an executory contract for the sale of timber a tenant in common with the vendor, the one having at most an equitable title in the quantity of timber covered by the contract, and the other having a legal title to the land and all of the timber. Furthermore we hold that the defendant has waived the plea in abatement.

■ It is the defendant's position that it purchased on contract all of the merchantable timber on the land. If defendant is right in this, there could be no tenancy in common. Such a tenancy could not in any event arise unless defendant or the court adopts the plaintiffs' theory as to the construction of the contracts, which could not be done without a trial on the merits. Assuming that the defendant could plead in abatement, matter which is directly contrary to its theory of the case, the fact remains that the validity of the plea could not be determined until the court had first decided the issues presented by the prayer for declaratory judgment. Counsel for the defendant said to the court, "although we seek to abate the timber trespass, at the same time we do want a determination of these very matters that are before the Court so that these parties will know what this contract means." Those issues involving the merits were

first decided by the trial court, and the plea in abatement was therefore waived. *McIntosh Livestock Co. v. Buffington,* 116 Or 399, 405, 241 P 393; *Klamath Lumber Co. v. Bamber,* 74 Or 287, 142 P 359, 145 P 650.

As we have said, the defendant filed what was designated as a counterclaim for declaratory judgment in which he set forth the conflicting claims of the parties as we have previously outlined them, and asked for a declaration that the contract was ambiguous and that it be construed in accordance with defendant's contentions. Plaintiffs, without challenging the propriety of the counterclaim for declaratory judgment, filed an answer denying the alleged good faith of defendant; denying the construction of the contract as claimed by defendant; denying that the parties to the contract intended to sell all of the merchantable timber on the premises, and in general, contending that the contract was clear and unambiguous. We quote:

"V.

" * * * plaintiffs admit and contend that said agreement permits the cutting and removal of not more than 6,701,000 board feet of merchantable pine timber from all of the properties described in said agreement and in this regard allege that the defendant is restricted as purchaser to the removal of the amounts from each tract as designated following the legal description thereof, and as specifically set forth in said agreement."

A question arises as to the propriety of the employment by the defendant of the declaratory judgment procedure in this case. A similar question was presented in *Recall Bennett Com. v. Bennett et al.,* 196 Or 299, 249 P2d 479. In that case plaintiffs brought a suit for declaratory judgment and for injunction,

their contention being that the name of Bennett should not be placed on the ballot. The defendant, registrar of elections, prayed for a declaration concerning his rights and duties under the law, and a prayer was made for a similar declaration by the county clerk. The novel question as to the right to seek a declaratory judgment by a cross complaint or counterclaim was considered and the authorities were quoted at length. We will not repeat what was said there. We held that the court had jurisdiction to declare the rights and duties of the defendants pursuant to their cross complaint. We did not hold that the assumption of jurisdiction was mandatory. See authorities cited.

In the pending case none of the parties is in a position to challenge the action of the trial court in proceeding first to try the action for declaratory judgment contained in the defendant's pleading. Both joined in the prayer for a declaration and agreed in substance as to the nature of the justiciable controversy. No objection was made to the procedure whereby defendant acting as plaintiff presented its evidence first. The peculiar feature of this case, however, is that, so far as we can see, most of the identical issues presented by the cross complaint of defendant and the plaintiffs' answer thereto were directly involved and the same evidence was admissible under the defendant's general denial of the allegations of the plaintiffs' complaint. The plaintiffs have accused the defendant of timber trespass. The defendant alleges the execution of the contract of purchase and sale. Plaintiffs admit the contract. The parties are agreed as to the amount of timber cut by defendant and where it was cut. If the contract is clear and unambiguous its terms will determine whether that timber was lawfully or unlawfully cut. If the contract is am-

biguous, then the trial court was required to ascertain the true import of the contract by applying the rules applicable to the construction of ambiguous contracts and by receiving extrinsic evidence pursuant to those rules.

The plaintiffs' action for trespass is directly dependent upon the true meaning of the contract, which is the question presented by the cross complaint. If the contract was ambiguous, as the trial court held, then the defendant was entitled to present evidence to remove the ambiguity without any cross complaint. We quote:

"Defendant's showing of an actual issue between the parties will not support a counterclaim for declaratory judgment where such issue or controversy is determinable under the pleadings other than defendant's demand for declaratory judgment; and where the issue made by the amended complaint and answer requires a finding on the very issue sought to be determined by a declaratory judgment demanded by defendant's counterclaim, the counterclaim should be stricken. Where it turns out at the trial that a decision on the merits of plaintiff's bill will completely dispose of the controversy between the parties and render declaratory judgment unnecessary, the counterclaim for declaratory judgment may be dismissed; likewise, there is no need, nor would it be proper, to introduce, by way of counterclaim, a proceeding for declaratory relief into a pending action in which the matter on which declaratory relief is sought is at issue in the original suit, and can, if need be, be determined at the trial. In particular circumstances, a counterclaim for a declaratory judgment has been held not subject to dismissal as being merely the converse of the relief demanded by the complaint, and not barred on the ground that plaintiff's complaint and the causes of action asserted by him therein constitute a pending action or pro-

ceeding between the same parties and for the same cause, and so fashioned that the adjudication of the one would of necessity dispose of the issue raised in the other." 26 CJS 328, Declaratory Judgments, § 139.

The following cases support the text: *Midwest Transfer Co. v. Preferred Acc. Ins. Co.,* 342 Ill App 231, 96 NE2d 228; *Bendix Aviation Corp. v. Glass,* 110 FSupp 368; *Leach v. Ross Heater & Mfg. Co.,* 25 FSupp 822, 104 F2d 88.

■ While under the authorities we could perhaps strike the cross complaint, we hold that it would be improper in this case to do so. It was in truth an amplification of the general denial when pleaded, but in the course of the trial the parties by common consent and with the approval of the trial court, broadened the issues under the pleading for declaratory judgment somewhat beyond those which would arise under a general denial of the trespass. The only trespass charged in the complaint consisted of the alleged unlawful taking of pine timber, no fir being mentioned. The contract covered both pine and fir. At a late stage of the case the court called attention to the desirability that the rights in the fir be determined. Counsel for defendant then said: "We would be doing our client a disservice if we didn't include all features of the lawsuit." Counsel for plaintiff replied: "If the Court feels that this matter will be probably before you insofar as the exhibits and insofar as the evidence is concerned, I would be willing for the Court to consider, in a declaratory judgment here, what the Court feels appropriate to the fir and also to the pine." The court said: "* * * I will proceed accordingly." Under these circumstances we will consider all of the issues in the declaratory judgment proceeding.

■ The first issue going to the merits is whether the contract is ambiguous, thus authorizing the receipt of extrinsic testimony. The trial court held that it was. We now direct our attention to that issue. The contract provides:

"The Seller does hereby agree to sell and the Purchaser does hereby agree to buy, cut and remove from the premises hereinafter described all of the following merchantable pine and fir timber located on the following described premises, the same to be trees which will cut logs the tops of which must be ten inches in diameter."

Considered alone this paragraph would appear to be clear and unambiguous except that one must look elsewhere in the contract for a description of the "following described premises". It would appear that the paragraph is complete as to the amount of timber involved, and that it was unnecessary to specify the amount of timber measured in board feet because the word "all" included all specified timber on the premises later described. Confining our attention to this paragraph, it appears that "the following merchantable * * * timber" refers to the words "the same to be trees which will cut logs * * * ten inches in diameter." In substance, the defendants contend that this paragraph means what it says. The plaintiffs, however, direct attention to the next paragraph of the contract which states that the "property has been cruised" and that the parties have agreed on the number of board feet upon each tract, and which states the amount of pine timber on each tract. They contend that "all of the following merchantable * * * timber" refers not to all thereof having ten-inch tops on the described premises, but only to a part of such timber, namely, 6,701,000 feet, the amount stipulated as being on the eight tracts.

The provision that the defendant shall pay for "said pine timber at the rate of $1.75 per thousand board feet", if read with the last-quoted paragraph of the contract, would require payment by defendant for all the specified timber on the eight tracts at that rate (the result reached by the trial court), but the contract names the "total purchase price" as $11,726.75 which is reached by figuring 6,701,000 feet of pine at $1.75 per thousand. Defendant claims that on payment of $11,726.75 it has acquired all of the described timber whether it be more or less than the stipulated amount. If it was the intention of the parties to sell only 6,701,000 feet of pine timber for $11,726.75, then there was no reason for specifying that payment be at the rate of $1.75 per thousand. Again, we observe that the contract purports to state the amount of timber on Tracts 1 and 2 as being 434,000 and 1,015,000 feet respectively, or a total of 1,449,000 feet, yet both parties admit that 5,031,395 feet of pine timber was removed by the defendant from the two tracts on which, according to the contract, there was only 1,449,000 feet. It is agreed therefore that defendant cut from the two tracts 3,582,395 feet more than the amount which the contract says was on the two tracts. Thus a consideration of pleadings and evidence raises an ambiguity if one was not before evident.

The meaning of the contract is even more clouded with uncertainty when we consider another aspect of the case. Assuming that the defendant was permitted to cut 6,701,000 feet of merchantable pine timber, as plaintiffs "admit and contend", but was limited to the cutting of that amount and no more, the question is whether it was "restricted * * * to the removal of the amounts from each tract" which are specified in the contract as being on those tracts

respectively. At no point in the contract is it specifically stated that the defendant is limited to the cutting of 434,000 feet of pine timber from Tract 1, or to the cutting of 1,015,000 feet from Tract 2. The plaintiffs seek to draw that conclusion from the fact that the contract, contrary to fact, states that those are the amounts of timber on those tracts. We are unable to conceive of any benefit which could come to the plaintiffs by such an apparently unreasonable construction. Plaintiffs' construction of the contract would require the logging of comparatively small quantities of timber from each of eight separate tracts. The printed abstract of record fails to give the description of the eight tracts, but examination of the original amended complaint shows that Tract 1 is in Section 1; Tract 2 in Section 11; Tract 3 in Section 12; Tract 4 in Section 14, all in Township 4 South, Range 29, E.W.M. Tract 5 is in Section 6; Tract 6 in Section 7; Tract 7 in Section 8; Tract 8 in Section 18, all in Township 4 South, Range 30, E.W.M.

The eight tracts include 2,680 acres of timber land in eight different sections and two different townships. We know from the pleadings that there was at least 5,031,395 feet of pine timber on Tracts 1 and 2 alone, and the trial court found that in 1940 there was approximately 17,000,000 feet of merchantable pine timber on the premises. Still assuming that defendants were permitted to remove only a total of 6,701,000 feet of pine timber, it seems preposterous to contend that they must range over the entire 2,680 acres, taking a little from each tract at far greater expense than would be involved in doing a clean job of logging on a part only of the tracts, with the result that the plaintiffs would also be required, if they logged the remaining timber, to go a second time

over the same total area. It is significant that even if the defendant was restricted to the taking of 6,701,000 feet of pine timber, it could not be liable for any timber trespass unless it was also restricted to the removal from each tract of the amount of timber set forth in the contract as being on such tract, for it has not yet removed the footage expressly authorized.

Another area of uncertainty suggests the necessity of extrinsic evidence to clarify the intent of the parties. Subject matter of the contract is "merchantable pine and fir timber."

In *Hughes v. Heppner Lumber Co.,* 205 Or 11, 15, 283 P2d 142, 286 P2d 126, this court said: "What is merchantable timber, in the absence of agreement, is a question of fact." Again, in the opinion on rehearing, the court said:

"As pointed out in Dahl v. Crain, 193 Or 207, 237 P2d 939, it is difficult to define merchantable timber which will fit all occasions in all localities. It has no definite fixed meaning and many factors must be considered in a given case in determining what is or is not merchantable." 205 Or at 57.

In *Dahl v. Crain,* supra, 193 Or 207, 225, 237 P2d 939, this court said:

"It may be conceded that there is no definition of 'merchantable timber' which will fit all occasions and all localities. Although a term very frequently used in timber sales contracts, as it was used in the contract here, nevertheless, it is one having no definite and fixed meaning. What may be 'merchantable timber' at one time or place may not be deemed such at another time or place. In determining what is covered by the term at a particular time and in a particular locality many factors are considered. Size and quality are of prime importance. Location, accessibility, demand, and market conditions are regarded. We do not

assume to enumerate all the elements involved in the term. * * *"

Again, in *Parsons v. Boggie,* 139 Or 469, 11 P2d 280, the contract called for the sale of "all good merchantable timber" on certain land. This court said:

"* * * The court must, as far as possible, construe the instrument from the words used as showing what the parties had in mind at the time of its execution. The respondent sold and the appellant bought with the understanding that the timber was to be removed. We must also take into consideration the circumstances surrounding the parties at the time the sale was made; also their attitude toward the subject matter subsequent to the execution of the contract. * * *"

The conclusion to be drawn from these cases is that the term "merchantable timber" in and of itself involves some ambiguity requiring a consideration of the surrounding circumstances and the "attitude toward the subject matter subsequent to the execution of the contract", i.e., the practical construction placed upon the contract by the parties.

In *Monger et ux v. Dimmick et al,* 187 Or 253, 257, 210 P2d 929, and *Dahl et al v. Crain et ux,* 193 Or 207, 225, 237 P2d 939, this court adopted a definition of "merchantable timber" (see infra) but in each case the court was careful to say that the definition was adopted "for the purposes of this case."

In *Tenney et al v. Mulvaney,* 9 Or 405, at an early date (1881), this court recognized that a log might be merchantable in one locality and not in another, owing to a difference in the settled usages of the business, and it was held proper to present extrinsic evidence of the usage in a given locality to show merchantability.

We approve of the conclusion of the trial court that there are features of the contract so clouded with uncertainty as to require the application of the rules of construction and the receipt of extrinsic evidence.

■ There is another respect in which the contract is of doubtful meaning. We refer to the rights of the defendant as to timber which existed at the time of the execution of the contract in 1943 and which did not then qualify as merchantable timber from "trees which will cut logs the tops of which must be ten inches in diameter", but which have since qualified or will qualify by reason of growth or change of conditions during the term of the contract as extended. Except as indicated below we entertain no uncertainty as to the meaning of the ten-inch requirement which appears in the very paragraph of the contract on which defendant relies. At a later point the contract employs unequivocal language as follows:

> "The Purchaser is to cut only trees, the logs from which will measure ten inches or more at the top, and agrees not to molest or cut any pine or other timber of smaller size than herein specified, and also agrees not to cut, molest or destroy any Tamarack or other timber located on the above described real property."

Clearly, defendant cannot cut any pine timber which when cut fails to comply with the double specification that it be merchantable and that it comply with the ten-inch requirement. However, the controversy relates to the date as of which the test of merchantability and size is to be applied. The plaintiff contends that defendant is limited to the cutting of timber which complied with the double requirement of merchantability and size in 1943 when the contract was executed. The defendant contends that the con-

tract also authorizes the cutting of such pine timber as shall qualify under the double requirement at any time during the life of the contract as extended. In this connection it is pointed out that the contract on May 4, 1943 gave to the defendant until November 1, 1957 in which "to remove the timber from said premises" and that in June 1950 the time for removal was extended to November 1, 1977. It is reasonable to assume that in the 34 years between the date of the contract and the end of the term a substantial quantity of timber which did not qualify under the ten-inch requirement in 1943 has qualified or will qualify thereunder by 1977. Again, our decisions have recognized that size, quality, location, accessibility, demand, and market conditions are regarded as elements involved in the word "merchantability". *Dahl v. Crain*; *Monger v. Dimmick*, both supra. We take judicial notice of the fact that market conditions had greatly changed between 1943 and the bringing of this action in 1955. What timber was merchantable at the various times in question of necessity depends upon evidence, and the fixing of the time as of which merchantability is to be determined might also require extrinsic evidence if that provision of the contract is found to be ambiguous.

We observe other respects in which the contract appears to be ambiguous, equivocal, or susceptible of conflicting interpretations. *Jaloff v. United Auto Indemnity Exchange,* 120 Or 381 at 388, 250 P 717. By the contract it is agreed that "before commencing to cut any timber on any tract as hereinabove described, that the Purchaser shall pay to the Seller the full purchase price for all of the timber located upon said tract of land as above mentioned  *  *  *." The contract also provides that "the sum of $3000.00 has here-

tofore been paid, * * *." The down payment was more than sufficient to pay in full for the timber which, according to the contract, was located on Tracts 1 and 2, yet there is no provision in the contract as to how or to what tract the $3,000 payment was to be applied. The contract requires the defendant to pay the full purchase price for all of the timber on any particular tract before cutting and also provides that

> "The Purchaser agrees to pay for all of the timber hereby agreed to be sold on or before November 1, 1957, and unless paid for on that date all of the Purchaser's rights to the remaining standing timber on said lands on that date shall cease and terminate."

Under plaintiffs' construction of the contract, these provisions would mean that defendant must pay $11,726.75 for 6,701,000 feet of pine timber by November 1, 1957. Unless so paid, all of purchaser's rights "to the remaining standing timber" terminate. But the question arises, what is the result if that payment was made (as in fact it was)? Is it implied that in such event the purchaser's rights to the remaining standing timber shall not terminate?

■ The trial court having correctly found that the contract was ambiguous proceeded to take testimony for the purpose of ascertaining the true intent and meaning of the contract under the rules governing construction in cases of ambiguity. In such an inquiry it was the duty of the court to consider all circumstances accompanying or surrounding the transaction, giving great weight to the principal apparent purpose of the parties, and so far as possible, placing itself in the position of the contracting parties. ORS 42.220; *Barmeier v. Oregon Physicians' Service,* 194 Or 659, 672, 673, 243 P2d 1053; *Erickson v. Grande*

*Ronde Lumber Co.,* 162 Or 556, 580, 92 P2d 170, 94 P2d 139; *Haynes v. Douglas Fir Exploitation and Export Co.,* 161 Or 538 at 549, 90 P2d 207, 761; *Teiser v. Swirsky,* 137 Or 595 at 604, 2 P2d 920, 4 P2d 322; *Jaloff v. United Auto Indemnity Exchange,* 120 Or 381, 388, 250 P 717. The court must be guided by the familiar provisions of statute concerning the interpretation of writings ORS 42.210 to 42.260 inclusive. It must take note of ORS 41.740, the statutory parol evidence rule and the proviso therein that "this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, \* \* \*." *Garrett v. Eugene Medical Center,* 190 Or 117, 130, 224 P2d 563. It must apply the familiar rule that

> "The practical interpretation of the terms of a contract made by the parties while performing it is universally deemed a safe guide to the intended meaning of the instrument." *Kontz v. B. P. John Furniture Corp.,* 167 Or 187, 115 P2d 319.

See also, *Miles v. S. P. & S. Railway Co.,* 176 Or 118, 125, 155 P2d 938; *Nunner v. Erickson,* 151 Or 575, 612, 51 P2d 839; *Wood v. Davin,* 122 Or 74, 78, 257 P 690; *Davis v. North Bank Dock Co.,* 294 F 336.

After the taking of testimony for the removal of ambiguity the trial court, sitting without a jury, made findings of fact and conclusions of law, and entered judgment. We shall summarize or quote the findings of fact by numbered paragraph, omitting formal findings not in controversy:

### "III."

On 4 May 1943 McDevitt and defendant executed the contract set forth supra in this opinion, which contract superseded that of 2 December

1940 and extended the time for removal. (The 1940 contract is in evidence and is substantially identical to the 1943 contract except that the term of the 1940 contract was to end on 1 November 1945 and by the 1943 contract the time was extended to 1 November 1957.)

## "IV."

Thereafter McDevitt sold the said real property to plaintiffs who on 6 December 1949 acknowledged that title to said real property was held by them subject to the 1943 contract "and the rights outstanding thereunder."

## "V.

" * * * defendant has paid the sum of $11,758.00 for pine and fir timber situated on said premises."

## "VI.

"That prior to and during the month of June, 1950, the defendant negotiated with the plaintiffs and with the said Charles McDevitt for an extension of time to permit the defendant an additional period of twenty years in which to remove all of the timber on said lands, including the growth thereof, as qualified for removal under the prior contract and as contemplated by the parties. That such an extension agreement was entered into extending the time for removal of timber until the 1st. day of November, 1977, * * *. That in consideration of the granting of such extension of time, the defendant paid to the plaintiffs the sum of $500.00 and conveyed to them more than two hundred acres of land situated in Morrow County and Umatilla County, Oregon."

## "VII.

"That during the years 1953 and 1954 defendant logged timber from lands described in Tracts 1 and 2 in the agreement of May 4, 1943, and removed therefrom a quantity of pine logs scaling approximately 5,031,395 board feet. That other and additional timber is now standing on Tracts

3 to 8 inclusive which has not yet been logged by the defendant. That during the year 1940 there was approximately 17 million board feet of merchantable pine on the real property above described and that the amount of merchantable fir timber on the said premises was an approximate amount of 800,000 board feet. That said footage total quantities pertained to timber qualifying and within the contemplation of the parties under the terms of the contract."

### "VIII."

A dispute has arisen as to the construction of the 1943 contract.

### "IX."

This paragraph states the plaintiffs' contentions as set forth in this opinion.

### "X."

Sets forth the defendant's contention as follows: That it "is entitled to cut and remove all of the pine and fir timber and the growth thereof qualifying under the contract and contemplated by the parties on the premise during the term of the agreement as extended."

The findings of fact XI, XII, XIII and XIV are set forth verbatim. It is to them that the plaintiffs object. Concerning them, we must determine whether or not they are supported by substantial evidence. The findings are as follows:

### "XI.

"That Charles McDevitt intended and agreed to sell and defendant intended and agreed to buy all of the pine and fir timber and the growth thereof qualifying and within the contemplation of the parties as aforesaid under the contract on the lands described in the agreement of May 4, 1943, at $1.75 per thousand board feet for pine and $1.25 per thousand board feet for fir.

## "XII.

"That Charles McDevitt was desirous of receiving a lump sum for such timber as was actually on the tracts and qualified for cutting under the contract and as contemplated by the parties. That said parties agreed to sell and buy this timber at such footage rates for the sole purpose of determining the amount to be paid in such lump sum and they roughly applied their rough estimate of the timber on the tracts to their arrangement in fixing the lump sum payment to be made, and arrived at footages shown in the contract and the sum of $11,758.00 as the total purchase price.

## "XIII.

"That the estimate of 6,701,000 board feet of pine and the estimate of 25,000 board feet of fir was a guess or estimate only and not intended nor accepted as any accurate commitment.

## "XIV.

"That the number of board feet following each tract description was tentative merely."

As conclusions of law the court found that the 1943 contract was ambiguous and that extrinsic evidence was admissible to aid the court in ascertaining the correct interpretations thereof. We agree. The second conclusion of law was incorporated in the final judgment and is as follows:

"* * * the defendant is entitled to cut and remove and is the owner of all of the pine and fir timber and the growth thereof qualifying and as contemplated by the parties under the contract from and on the real property described in said contract during the term thereof as extended to the 1st. day of November, 1977 by Agreement of Extension recorded * * *."

The judgment incorporated the finding of fact as to the amount of merchantable pine and fir on the

property in 1940 (see findings, paragraph VII). We quote further from the judgment, which follows the findings and conclusions of law:

"It is further ORDERED, ADJUDGED and DECREED that under the provisions of the said contract dated the 4th. day of May, 1943, that the defendant has paid the sum of $11,758.00 and that the defendant shall pay to the plaintiffs such further amount as remains unpaid for said pine and fir timber on said premises at a rate of $1.75 per thousand board feet for pine and $1.25 per thousand board feet for fir, and

"It is further ORDERED, ADJUDGED and DECREED that the estimate of 6,701,000 board feet of pine and the estimate of 25,000 board feet of fir timber, as set forth in the contract dated the 4th. day of May, 1943, was a guess and estimate only and not intended nor accepted as any accurate commitment, and that the number of board feet following each tract therein described was tentative merely,  *  *  *."

Then follow the rulings denying the plea in abatement, estoppel, and for reformation. Finally it was "ORDERED, ADJUDGED and DECREED that plaintiffs take nothing by their Amended Complaint and that the same be hereby dismissed."

In turning to the evidence it must be remembered that the case was by stipulation, tried by the court without a jury, that the only issues made by the pleadings which invoked the powers of a court of equity were decided against the defendant. The case was tried on the issues raised by the cross complaint for declaratory judgment which were substantially the same as those raised by the complaint charging timber trespass and the general denial. Whether defendant was guilty of trespass was dependent on its rights under the contract. The contract was prop-

erly held to be ambiguous and the court, based on extrinsic evidence, found the facts as to the true intent and meaning of the contract.

■■ The authority to receive extrinsic evidence to clear up ambiguity is not restricted to equity courts. The same power is vested in a court of law, as our decisions demonstrate. It follows that findings, if properly identified as findings of fact, are conclusive in a law action if supported by substantial evidence. *Garrett v. Eugene Medical Center,* supra; *Whitlock v. United States Inter-Insurance Association,* 138 Or 383 at 391, 6 P2d 1088; *Wilkins v. West States Grocery Co.,* 167 Or 103, 114 P2d 542 (action at law; lease held ambiguous, making a mixed question of law and fact for the jury); *Harlow v. Oregonian Publishing Co.,* 53 Or 272, 100 P 7; *Baker County v. Huntington,* 46 Or 275, 79 P 187.

■■ As we have said, each party presented a bill of exceptions which was settled by the trial judge. Our question is whether there was substantial evidence to support the findings of fact by the trial court.

We submit first a chronological summary of events:

| | |
|---|---|
| 2 December 1940 | original contract gives buyer seven years to 2 December 1947, payment for *all* to be on or before 1 November 1945. |
| 4 May 1943 | second contract extends time to 1 November 1957, i.e., adds 10 years. |
| 8 December 1943 | payment of $8,758 (full payment by contract figure). |
| April 1949 | plaintiffs bought property from McDevitt. |
| 6 December 1949 | plaintiffs acknowledge holding subject to contract. |

| | |
|---|---|
| Late 1949 | negotiations with defendant for extension. |
| 16 June 1950 | defendant conveys land to plaintiffs Doherty, reserving timber. |
| 20 June 1950 | extension agreement signed by the McDevitts and the Dohertys. Extends to 1 November 1977. Total length of contract as extended—37 years. Defendant pays plaintiffs $500 and conveys land in consideration of extension. Up to this time neither McDevitt nor plaintiffs had raised any question with defendant as to nature of contract. |
| 1 May 1953 | defendant entered and cut (first cutting was in Tract 1). Only cutting in 1953. |
| 1954 | defendant cut Tract 2. |
| 1954 | plaintiffs raised question as to who was paying the taxes. |
| 1954 | McDevitt died last of August. |
| October 1954 | defendant stopped cutting. |

We have set forth the findings of the trial court, and except as hereinafter specified, we approve them. The evidence supporting the findings was not only substantial—it was persuasive. A number of witnesses unequivocally supported the findings. Olive Hughes, then assessor of Morrow County, and a disinterested witness, testified that McDevitt said "that he didn't have any timber, that it had been sold previously to the Harris Pine Mills." J. S. Johns, vice president of the defendant company, testified that in 1948 or 1949 McDevitt said to him "that he had sold all of this timber to us, to Harris Pine Mills,

too cheap, and that he found he was paying the taxes on it and that wasn't fair." Johns told McDevitt "to find out how much the taxes were and we would pay them with interest." McDevitt consulted the assessor who promised to give him a statement of the taxes paid on the timber "so he could take them to Harris Pine Mills and get his money back." The assessor did so, and there is undisputed testimony that Harris Pine Mills paid to McDevitt substantial sums of money with interest by way of reimbursement for taxes paid by him, and that thereafter the taxes on the timber were assessed to the defendant company and were paid by it.

A check bearing date December 16, 1949 was given to McDevitt. The sum was $1,674.45, and on the back of the check appear the words "Taxes & Recording Contract Harris Pine Mills." The check bears McDevitt's endorsement. Other payments were made. There is similar evidence of payments made by the defendant on taxes on the timber in Umatilla County. Johns testified that he would not have paid the taxes "unless he [McDevitt] had sold all the timber to us." There is evidence that McDevitt was reimbursed for timber taxes paid prior to 1950 and back to 1943, with interest. We consider this and a mass of other evidence concerning the recognition by McDevitt that he had sold "all the timber", and concerning the payment of taxes by the defendant, to be highly significant support for the findings of the trial court.

The sum stipulated in the contract as the "total purchase price for the pine timber located on the hereinabove described tracts of land is $11,726.75" which plus $31.25 for the fir timber totals $11,758.00. Undisputed evidence shows that payments were made

on the original 1940 contract and on the 1943 extension, as follows:

| | |
|---|---|
| 1940 and 1941 | $ 1,000 |
| Feb. 1943 | 2,000 |
| Dec. 8, 1943 (after the extension contract was signed) | 8,758 |
| Total | $11,758 |

The negotiations leading up to the 1940 contract are significant. We quote from the testimony of Clyde Harris:

"A We told him that we had bought the Cunningham lumber, but that we were buying it on a cruise, and we always got more timber than we actually showed on the cruise, and he said that would be all right, that he'd get a cruise if we would pay $1.75, and we agreed with him that if he would get a cruise, that we would put a man out there to check his cruise, and we would give him $1.75 per thousand, if we could agree upon the cruise.

* * * * *

"A * * * We told him we'd take his timber on the cruise or we would buy it on a log scale basis. But he said he wanted to know how much he was getting, he wanted to know what he was doing, he didn't want to be fooling around with a grader or a —what do they call them—a measure —that is to measure the timber. He wanted us to take that responsibility and he wanted to sell it and know what he was getting. We told him, all right, we'd do that—a scaler—I couldn't think of the word.

"Q Then what happened after that?

"A He said that that would be satisfactory and we bought his timber."

Again, Clyde Harris testified:

"Q What conversation did you have in buying the timber with Mr. McDevitt?

"A We hesitated to give him the $1.75 as he

had asked on a cruise, and—and he said, 'You fellows—the way you take timber out of the forest, you will get more timber out of there than anybody else,' and we usually get a lot more timber than the cruise."

The 1940 contract provided that "The Purchaser agrees to pay for all the timber hereby agreed to be sold on or before November 1, 1945." In 1943 defendant asked an extension and offered to pay all or any part of the purchase price at any time so McDevitt would not have to wait until cutting was commenced, or until November 1, 1945 for full payment. As a consequence, the 1943 contract was written and, in addition to the extension of time to cut (to November 1, 1957) the provision of the 1940 contract was changed so as to provide that payment must be made by November 1, 1957 in any event, and that purchaser shall pay any part thereof or all thereof within 30 days after demand for payment, thus shortening the time of payment from November 1, 1945 to any time after 30 days from May 4, 1943 on demand being made. In fact, payment was made in the sum of $11,758, the final payment being on October 1, 1943.

The 1940 contract required payment by November 1, 1945 and provided for forfeiture in event of failure so to pay, but also provided that forfeiture should not relieve defendant of obligation to pay "as herein specified." Apparently the then intent was that defendant must pay $11,758 even if it cut no timber. The change made in 1943 required payment on demand without regard to the amount of timber cut. It will be remembered that in 1943 no timber had yet been cut.

Plaintiff Cornelius (Con) Doherty had no personal knowledge of or connection with the making of

the 1940 and 1943 agreements. He knew of the defendant's contract when he bought the land from McDevitt and took subject to their rights. When witness Clyde Harris heard that McDevitt had sold the land to plaintiffs Cornelius Doherty and wife, he went to McDevitt. McDevitt told Harris that he had informed Doherty that the defendant owned the timber. Harris specifically testified that in the negotiations preceding the 1950 extension McDevitt said:

"A * * * 'I am paying the taxes on this timber, and you own all the timber, I don't think that's fair. But if you will fix that item up, I don't see any reason or anything that will stand in your way of making the extension.'

"Q And what occurred after he said that?

"A He said he would go down and talk to Con, his nephew, and he did. I think Con was out building fences right at that particular time.

"Q And what was later done, do you know, with respect to taxes?

"A We told him that we would not only pay the taxes in the future but that we would reimburse him for such taxes he had paid out in the past.

"Q Are you referring to the land or to the timber?

"A Timber.

"Q And did that later come to pass?

"A Yes."

Witness Harris testified that he was familiar with the custom and practice of his and other mills in the area during 1939 and 1940. They would have a stand of timber appraised or cruised and would buy it on a lump-sum basis on the cruise or appraisal. They bought in that manner because it was difficult for the seller to keep track of the amount of timber being

taken and he would rather sell in a lump sum in order to know what they were going to get. Witness testified that such was the intent. There was substantial evidence that neither party to the 1943 contract knew how much timber was on the tract and that at that time it was normal practice to purchase timber for a lump sum on a scale furnished by the seller. When asked the purpose of the clause of the contract wherein it was said that the parties had agreed on the number of board feet upon each tract and wherein the respective amounts were specified, Clyde Harris testified:

"We had to have some basis before we could even go onto the tract and log it. In other words, he owned the timber and the land and we had no right on it before we paid for it. But is was agreed and understood by us that when we paid for that amount of timber on each tract, that we could go on and log that piece of land and log it all.

"THE COURT: If there was more timber on any one or more of these tracts than is indicated, you had a right to log it off and pay for it at $1.75 a thousand?

"THE WITNESS: No.

"THE COURT: How much?

"THE WITNESS: That was the lump sum sale.

\* \* \* \* \*

"THE WITNESS: Well, we had agreed that that's the amount of all the timber on those places, and when we had paid for that, all the timber belonged to us. As I said before, we had no alternative or comeback if it didn't, and if it was more than that, and the reason for that was that he wanted to know how much timber he had and how much money he was going to get for it, and so he would know what he was going to get and so he wouldn't have to watch us or anybody else. It was —that was a normal contract at that time. We had to have some basis, I will say, to pay him before

we could go on a tract, and if we didn't arrive at some figure, we wouldn't have known what to pay for whatever we were going to get in one tract."

The court received in evidence a duly executed and recorded contract between Charles McDevitt and wife and Cornelius A. Doherty and wife as first parties, and Harris Pine Mills, second party, which is of some assistance in resolving the ambiguity in the 1943 contract. The instrument was executed on 20 June 1950 (subsequent to the purchase of the real property from McDevitt by the plaintiffs). It recites that the 1943 contract gave to the purchaser until 1 November 1957 in which "to remove the timber from said premises as set forth in more detail in said agreement." It then provides for an extension of 20 years additional, or until 1 November 1977. The consideration for the extension was $500 plus a conveyance to Cornelius Doherty of more than 200 acres of land which the defendant owned and which lay next to plaintiffs' property. The money was paid and deeds to the land reserving to the defendant the timber were delivered to plaintiffs. The deeds bear date of 16 June.

Let us consider the situation of the parties at that time. In 1950 no timber from plaintiffs' land had been cut by defendants. They were then operating under the 1943 contract and had until 1 November 1957 to remove whatever they had bought. Thus in June 1950 they had over seven years to remove what the plaintiffs claim was only 6,701,000 feet of pine timber and 25,000 feet of fir. It is admitted that in 1953 and 1954 the defendant logged 5,031,395 feet of pine. On plaintiffs' construction of the contract, that left them all of 1955 and 1956 and 10 months of 1957 to cut and remove the difference between 6,701,000

feet and 5,031,395 feet, or the comparatively insignif-
icant amount of 1,669,603 feet of pine, and $31.25
worth of fir.   Yet in 1950 defendant was willing to
pay $500 and convey more than 200 acres of land for
an extension of time of 20 additional years in which
to cut and remove the timber.   Clyde Harris, assistant
manager of the defendant company, testified that they
could remove the balance of all of the timber on the
eight tracts in about six months.   It is to us incon-
ceivable that at that time they would have paid such
a consideration if they had not in good faith under-
stood and believed that they were entitled to cut more
timber than the 6,701,000 feet.   When, in 1950 de-
fendant had seven years to cut 6,701,000 feet, it is
hardly believable that it would have paid such sums
for an extension to 1977 in which to cut that amount
of timber.   If, however, the parties understood the
contract to cover all merchantable pine timber from
trees that would cut logs 10 inches in diameter at the
top, and if, as the court found, there was about
17,000,000 feet of timber qualifying under the con-
tract, then the extension agreement would be highly
reasonable.

The plaintiffs contend that the contract of 1943
should be construed most strongly against the defend-
ant because it appears that the contract was probably
drawn by Randall and Perry who were attorneys for
the defendant, since their names appear on the cover.
We do not think that the rule thus invoked should
be applied, for the following reason.   The 1943 con-
tract follows the 1940 contract verbatim except for
the provision extending the time, and some other slight
alterations to be noticed later.   McDevitt prepared
the 1940 contract, or caused it to be prepared.   Except
for the extension provisions the 1943 contract there-

fore adopts the meaning of the 1940 contract, which certainly shows no indication of skilled or lawyer-like drafting.

The trial court rejected the construction of the contract for which plaintiff contended, but did not wholly approve defendant's construction. By its cross complaint for declaratory judgment defendant stated its construction of the contract to be that they were entitled to cut all of the merchantable pine timber and that they have paid the entire purchase price therefor. The testimony shows that defendant believed that by the payment of $11,726.75 for the pine and $31.25 for the fir they had paid for all of the merchantable pine and fir timber in a lump-sum transaction. The trial court, as we have shown, gave prime consideration to the provision of the contract whereby purchaser agreed "to pay for the said pine timber at the rate of $1.75 per thousand board feet" and for the fir timber at the rate of $1.25 per thousand, while rejecting the binding effect of the tentative agreement that there was 6,701,000 feet of pine and 25,000 feet of fir to be cut. The court, pursuant to such conclusion, adjudged that defendant had paid $11,758.00 and "shall pay * * * such further amount as remains unpaid for said pine and fir timber on said premises at a rate of $1.75 per thousand board feet for pine and $1.25 per thousand board feet for fir", thus giving credit to defendant for the full amount paid but rejecting defendant's claim that the amount paid constituted payment in full. We would have some doubt as to the correctness of this portion of the judgment, but its correctness is not before us for determination. The defendant has not appealed from any portion of the judgment except from the portions denying the pleas in abatement and reformation. De-

fendant's bill of exceptions contains no challenge to this portion of the judgment and in its brief the defendant takes note of the adverse ruling in question but urges "that the judgment of the eminent trial judge should not be disturbed." Perhaps both court and counsel for defendant had in mind the extraordinary increase in value of timber since 1943 and made some concessions in the interest of fairness.

There remains one serious question for consideration. The defendant's cross complaint does not refer to the "growth" of the timber nor does it plead or present any facts showing any ambiguity in the particular portions of the contract which provide for the sale of "merchantable" pine and fir timber and which further provide that purchaser is to cut "only trees, the logs from which will measure ten inches or more at the top * * *." In our opinion those provisions were clear and explicit. The contract contained no specific provisions concerning the time as of which size or merchantability was to be determined.

Defendant's witnesses claimed that they were entitled to all growth which had occurred since the execution of the contract but we find no pleading or evidence of any understanding between the parties other than that which appears on the face of the contract as to what "growth" was sold or when size and merchantability were to be determined. We do not think that the defendant or its witnesses intended to claim a construction which would give to them literally "all timber" and which would eliminate the unambiguous requirements of size and merchantability. The court recites in findings presumably submitted by the defendant that defendant construes said agreement to provide that defendant "is entitled to cut and remove all of the pine and fir timber and the

growth thereof qualifying under the contract and contemplated by the parties on the premise [sic] during the term of the agreement as extended." Clearly the defendant only claimed what qualified under the contract. Also clearly the court found defendant was entitled only to timber and growth thereof "qualifying" under the contract. (See Judgment)

The ambiguity on this point is not in the contract but it does somewhat appear in the findings and judgment. Of course timber which was merchantable and complied with the 10-inch requirement when the 1943 contract was executed continued to grow, and of course defendant was entitled to such growth. But the contract provided that defendant shall not molest or cut any timber of smaller size than specified. In a contract, the life of which extends to 1977, it is obvious that much timber "of smaller size" in 1943 will satisfy the requirements of merchantability and size before 1977. Whether or not such timber may be cut by defendant is the final question in this case. This is a question of law of immense importance whenever a cutting contract is of long duration and when, as here, there is no specific provision to include timber which was not but will be qualified under the specifications of size and merchantability in the contract.

The defendant in his brief asserts that "all merchantable timber," as those words are used in the contract under consideration, is "all timber—whatever its size—that had, at the date of the contract, or may have during the life of the contract, a commercial value * * *." In support defendant cites *Monger et ux v. Dimmick et al,* 187 Or 253, 210 P2d 929; *Dahl v. Crain,* 193 Or 207, 237 P2d 939; *Tenny v. Mulvaney,* 9 Or 405; and *Adams v. Hazen,* 123 Va 304, 96 SE 741.

Defendant recognizes that its rights are limited by the 10-inch provision. We quote from defendant's brief:

> "* * * The judgment permits the defendant to log merchantable pine and fir timber which will produce logs with a ten inch top from the premises until 1977, without regard to whether such timber was merchantable in 1940."

We think neither findings nor judgment go that far, but the quoted statement clearly defines the issue.

Plaintiffs, in addition to their claim that the contract covers only 6,701,000 feet of pine and 25,000 feet of fir, contend that the only timber covered by the contract is that which was merchantable and of the required size in 1943. Plaintiffs rely upon *Hughes v. Heppner Lumber Co.,* supra, 205 Or 11, 283 P2d 142; *Rayburn v. Crawford,* 187 Or 386, 211 P2d 483; *Parsons v. Boggie,* 139 Or 469, 11 P2d 280, and other cases later cited. At this point we find conflict, not in the contract nor the judgment of the trial court, but in the decisions of this court. Both parties cite *Tenny v. Mulvaney,* supra, 9 Or 405 (1881). That case does discuss the meaning of "merchantable" but does not discuss the question of the time as of which it is to be determined.

In *Parsons v. Boggie,* supra, (1932) the vendor agreed to sell "all the good merchantable timber on his land" with a right to remove it "at any time." In accordance with the usual rule it was held that the purchaser had only a reasonable time for removal, but the court also said of the contract:

> "Assuming that the foregoing instrument is a grant of the 'good merchantable timber' on the premises described, it is a grant only of the merchantable timber on the land at the date of contract. Robertson v. H. Weston Lumber Co., 124

Miss. 606 (87 So. 120). It does not attempt to convey any timber maturing after that date. * * *"

We next consider *Monger et ux v. Dimmick et al,* supra, decided in October 1949. The contract provided that vendors "agree to sell" all of the merchantable timber on said above described lands. Vendors sought a decree declaring the contract rescinded because of breach thereof by defendants. Among other alleged breaches was the cutting of piling by the vendees. The court found numerous breaches of contract by vendees, including the cutting of piling. We have examined the briefs on appeal and the opinion of this court and find no issue raised or discussed as to the time as of which merchantability is to be determined. Nevertheless the court in an opinion by Justice HAY said:

"* * * For the purposes of this case, we adopt the following definition of the term:

"'* * * "all merchantable timber," as those words are used in the contract under consertion, is all timber—whatever its size—that had, at the date of the contract, or may have during the life of the contract, a commercial value in that locality, for the purpose of manufacture into lumber, or for any other purpose. * * *'"

Citing *Adams v. Hazen*, 123 Va 304, 323, 96 SE 741, 746, also cited supra. All of the quotation from *Adams v. Hazen* was appropriate to the case except the words "or may have during the life of the contract," which were wholly irrelevant. The words "whatever its size" were appropriate to that case because the contract contained no requirement as to size but only as to merchantability. Those words have no applicability in the pending case because both size and merchantability are specified.

We next turn to *Rayburn et ux v. Crawford et ux,* decided one month after *Monger et ux v. Dimmick et al.* This opinion was also written by Justice HAY. In March 1946 the vendors contracted to sell and the vendees to buy certain lands. The parties had agreed that vendors reserved the timber but by a scrivener's error the reservation was omitted from the contract. This court held that the contract should be reformed to accomplish the intended result. No time was specified within which the vendors might remove the timber, so the court, following *Parsons v. Boggie,* held that the reservation was for a reasonable time. It then said:

> "We are of the opinion that the reservation of the merchantable timber in this case was a reservation only of that timber upon the land which was merchantable at the date of the execution of the contract. * * *" 187 Or 386, 399, 211 P2d 483.

Thus within a period of one month the court construed one contract as including timber which had "or may have during the life of the contract" merchantability, and construed another contract as including only timber which was merchantable at the date of the execution of the contract. The fact that the time for removal of timber in *Monger v. Dimmick* was eight years and that the term in *Rayburn v. Crawford* was for a reasonable time constitutes in our opinion a "distinction without a difference".

The next case for consideration is *Dahl et al v. Crain et ux,* supra, 193 Or 207, 237 P2d 939 (1951). Plaintiffs as purchasers sought specific performance of a contract for the purchase from defendants of merchantable pine timber. The contract was executed in August 1946 and the term thereof ended in December 1955. Here again there was a controversy as to

what was merchantable timber, but not as to the time as of which merchantability is to be determined, yet the court said:

"* * * However, for the purposes of this case, we adopt the same definition adopted by Mr. Justice HAY in *Monger et ux v. Dimmick et al.,* 187 Or 253, 257, 210 P2d 929; to-wit:

"'* * * "all merchantable timber," as those words are used in the contract under consideration, is all timber—whatever its size—that had, at the date of the contract, *or may have during the life of the contract,* a commercial value in that locality, for the purpose of manufacture into lumber, *or for any other purpose.'* (Italics ours.)" 193 Or at 225.

Finally, we come to *Hughes v. Heppner Lumber Co.,* supra, 205 Or 11, 283 P2d 142, 286 P2d 126. In February 1939 plaintiffs deeded to the predecessor of defendant all pine and merchantable fir timber on 116 acres of land here involved. Two days later the grantee of the timber conveyed to the plaintiffs 692 acres of the land in litigation, reserving all of the pine and merchantable fir timber thereon "with the right to log the same at its convenience." The defendant succeeded to the rights in the reserved timber. This court stated the issue thus: "did defendant remove all the merchantable timber as contemplated by the parties in 1939, during the years 1939 to 1948, inclusive?" The court continued:

"The parties agree on the issues, at least in respect to this question. Defendant claims and plaintiffs disclaim that the timber now contended for was merchantable timber in 1939. Defendant asserts therefore that they have a reasonable time to remove it. If the timber, however, was not merchantable at that time it follows that the 'rea-

sonable time for removal' doctrine would have no applicability.

> "A grant of merchantable timber is a grant only of the merchantable timber on the land at the date of the contract. Rayburn et ux v. Crawford et ux., 187 Or 386, 398, 211 P2d 483." 205 Or at 14.

The defendant after 1948 ceased to log and made no claim to any remaining timber until 1951 when the price had "soared some 400 per cent." The majority of the court held that in 1951 a reasonable time for removal of the reserved timber had expired. Two judges dissented on this issue but they agreed with the majority on the time as of which merchantability and size are to be determined. From the dissent of Justice WARNER, concurred in by Justice TOOZE, we quote:

> "* * * The general rule is that when standing timber of designated dimensions or to be used for designated purposes is sold, only such timber is conveyed as measures up to such dimensions or is suitable for the purposes specified *as of the date of the deed or contract of sale*. 34 Am Jur 504, Logs and Timber, § 22; 54 CJS 696, Logs and Logging, § 17b. * * *" 205 Or at 39.

In the opinion denying petition for rehearing the majority said:

> "It is next argued that on the authority of Monger v. Dimmick, supra, defendant was not limited to the timber that was merchantable in 1939. In that case we quoted from Adams v. Hazen, 123 Va 304, 96 SE 741. It has never been the law in Oregon that merchantable timber is that timber which has commercial value 'during the life of the contract.' This clause was inadvertently included in the Monger quotation. Tenny v. Mulvaney, 9 Or 405; Parsons v. Boggie, 139 Or 469, 11 P2d 280; Rayburn et ux. v. Crawford et ux., 187 Or 386, 211 P2d 483." 205 Or at 59.

Thus the dictum in *Monger v. Dimmick* was expressly overruled and the dictum in *Dahl v. Crain,* supra, was overruled by necessary implication. The law as laid down in *Hughes v. Heppner Lumber Co., Rayburn v. Crawford,* and *Parson v. Boggie,* is supported by the great weight of authority. See 34 Am Jur 504, Logs and Timber, § 22; 54 CJS 696, Logs and Logging, § 17b; Kinney, Essentials of American Timber Law, § 120, p 156; *Moore v. Knott Co.,* Ky 273 SW2d 842; *Cool v. Blackburn,* 291 Ky 393, 164 SW2d 946; *Polley v. Ford,* 190 Ky 579, 227 SW 1007; *Overby v. Burnham,* 190 Miss 435, 200 So 591; *Robertson v. H. Weston Lumber Co.,* 124 Miss 606, 87 So 120; *Miller-Brent Lumber Co. v. Dillard,* 201 Ala 18, 75 So 308; *Wright v. Bentley Lumber Co.,* 186 Ala 616, 65 So 353; *Griffin v. Anderson Tully Co.,* 91 Ark 292, 121 SW 297; *Union Bag and Paper Corp. v. Mitchell,* 177 F2d 909; *Holly Hill Lumber Co. v. Grooms,* 198 SC 118, 16 SE2d 816; *Warren v. Short,* 119 NC 39, 25 SE 704; *Cooley v. Meridian Lumber Co.,* 195 La 631, 197 So 255.

In view of the history of *Monger v. Dimmick* and *Rayburn v. Crawford,* we are convinced that this court in the Monger case inadvertently quoted the portion of the opinion in *Adams v. Hazen* which reads *"or may have during the life of the contract".* The true rule was stated one month later in Rayburn's case. In any event we adhere to the rule as stated by both majority and minority of this court in *Hughes v. Heppner Lumber Co.*

We hold that the plaintiffs have failed to show any timber trespass. Defendant was not restricted to the cutting from each tract the amount of timber specified in the contract as being thereon. It was in any event entitled to cut 6,701,000 feet of pine, which it has not yet done.

The finding of the trial court to the effect that there was in 1940 approximately 17 million board feet of merchantable pine and 800,000 feet of fir and that "said footage total quantities pertained to timber qualifying and within the contemplation of the parties under the terms of the contract" is sustained by the evidence. A cruise in 1956 showed that there was then on the property 810,000 feet of fir, 485,000 feet of which measured 16 inches and over, 255,000 feet of which was 12 to 16 inches in diameter and 80,000 feet of white fir. The cruise also showed over 17,000,000 feet of Ponderosa pine 12 to 16 inches in diameter. Defendant had cut over 5,000,000 feet in 1953 and 1954. Making due allowance for the fact that the 1956 cruise probably included some timber which did not qualify in 1943, it is apparent that there was in 1940 and in 1943 approximately the amount of qualified timber as stated by the trial court. We are further of the opinion that the rate of growth of pine and fir in the vicinity is susceptible of proof as determinative of what trees now on the land were embraced within the terms of the 1943 contract. *Hardison v. Lilley,* 238 NC 309, 78 SE2d 111, 116.

Expert testimony was received that on the entire area there had been a gross growth of 3,400,000 feet in the 15 years following the Mead & Mead cruise, but the witness did not segregate the growth in trees which qualified under the contract in 1943 from the growth in trees which were not qualified in 1943 but have qualified as to size and merchantability since. Nor did he have any estimate as to how much should be deducted from the gross amount of growth by reason of windfall, beetle-kill, disease and old age. On this issue we can do no more than lay down the rule of law which must guide the parties in future dealings.

The judgment that plaintiffs take nothing by their amended complaint is affirmed. The judgment denying the pleas in abatement, for reformation and estoppel, is affirmed. As to the declaratory judgment; we hold that defendant is entitled to cut all of the pine and fir timber which on 4 May 1943 was merchantable and which at that time complied with the 10-inch requirement of the contract as to the size of logs. Defendant is not entitled to cut any timber which did not on that date meet the contract requirements as to merchantability and size. In all other respects the declaratory judgment is affirmed.